**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

YOLANDA S. BALKNIGHT

　　　　　　*Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

　　　　　　*Defendant*.

_____/

CASE NO. 18-11843

DISTRICT JUDGE ROBERT H. CLELAND

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 21, 22)

## I.　RECOMMENDATION

Plaintiff Yolanda Balknight challenges Defendant Commissioner of Social Security's final decision denying her claims for Title II Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The case was referred to me for review. (R. 17); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Balknight's Motion for Summary Judgment, (R. 21), **GRANTING** the Commissioner's Motion, (R. 22), and **AFFIRMING** the Commissioner's final decision.

## II.　REPORT

### A.　Introduction and Procedural History

This is not Balknight's first application for disability benefits. *See* (R. 16, PageID.199.) Most recently, she sought DIB and SSI in 2012. (*Id.*) An administrative law

1

judge (ALJ) denied her claims on December 27, 2013, and the Appeals Council declined review. (*Id.*, PageID.175, 199.) In 2015, this Court upheld the ALJ's decision. *See Balknight v. Comm'r of Soc. Sec.*, No. 2:15–cv–10341, 2015 WL 7247562 (E.D. Mich. Oct. 23, 2015), *Rep. & Rec. adopted by* 2015 WL 7180388 (E.D. Mich. Nov. 16, 2015).

Balknight filed her current applications for DIB and SSI on December 23, 2015, (R. 16, PageID.390), and later alleged that she became disabled on December 1, 2013 (*id.*, PageID.400). The Commissioner denied the claims. (*Id.*, PageID.215.) Plaintiff then requested a hearing before an ALJ, which occurred on July 31, 2017. (*Id.*, PageID. 106-42, 299.) The ALJ issued a decision on September 26, 2017, finding Plaintiff was not disabled during the relevant period. (*Id.*, PageID.78-94.) On April 12, 2018, the Appeals Council denied review. (R. 11, PageID.33-35.) Plaintiff sought judicial review on June 8, 2018. (R. 1). The parties have filed cross-motions for summary judgment and briefing is complete. (R. 21, 22, 24.) The case is now ready for resolution.

### B.  Standard of Review

The court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . .

. It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the

duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other

jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Balknight was not disabled. (R. 16, PageID.78-94.) At step one, the ALJ found that she had not engaged in substantial gainful activity since her alleged onset date. (*Id.*, PageID.81) At step two, the ALJ concluded that Balknight had the following severe impairments: degenerative joint disease, degenerative disc disease, tarsal tunnel syndrome, carpal tunnel syndrome, obesity, diabetes, peripheral neuropathy, reflex sympathetic dystrophy (RSD), asthma, hypertension, mood disorder, osteoarthritis, and systematic lupus erythematosus. (*Id.*) The prior ALJ decision, from 2013, included the same severe impairments except for osteoarthritis and systematic lupus erythematosus. (*Id.*, PageID.157.)

At step three, the ALJ determined that she did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.*, PageID.81-84.) Before proceeding to the final steps, the ALJ found that Balknight had the RFC to perform

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the opportunity to alternate position for up to 5 minutes approximately every 30 minutes; no climbing of ladders or stairs; occasional stooping; no kneeling, crouching or crawling; frequent handling, fingering and feeling; no exposure to hazards or vibration; no use of foot or leg controls; no concentrated exposure to fumes, dusts or gases; and no exposure to extremes of temperature or humidity. She is limited to simple, routine, repetitive work, and should be able to wear and [*sic*] orthopedic boot while working.

(*Id.*, PageID.84.) That RFC matched the earlier RFC from the 2013 ALJ decision. (*Id.*, PageID.159.) At step four, the ALJ found that Balknight could not perform her past relevant work. (*Id.*, PageID.167.) Finally, at step five, the ALJ determined that she could perform a significant number of jobs in the national economy. (*Id.*, PageID.168-69.)

### E.   Administrative Record

### 1.   Medical Evidence

The first medical report in the record comes from February 2013, roughly 10 months before the disability onset date.[1] (R. 16, PageID.490.) The report recounts a trip to the emergency room to treat pain and swelling in her left foot. (*Id.*, PageID.492-93.) She denied any neurological or psychiatric issues. (*Id.*, PageID.493, 496, 502.) The examination confirmed her complaints of tenderness and swelling but turned up nothing else unusual about her musculoskeletal or neurological functioning. (*Id.*, PageID.493-94, 497, 503, 514.) X-rays of her ankle likewise were normal aside from a small heel spur. (*Id.*, PageID.506-07, 510.) On discharge, she could walk without distress. (*Id.*, PageID.505.) And when she returned the next month, this time complaining of persistent back pain, the examination notes tell that she had "[n]o trouble walking." (*Id.*, PageID.516.) Besides tenderness and spasms in her back, the rest of the examination results were normal, including her strength, reflexes, sensory perceptions, and range of motion. (*Id.*, PageID.517.)

---

[1] For a discussion of her previous records, see *Balknight*, 2015 WL 7247562, at *3-8.

Her back still hurting a few days later, she went again to the emergency room. (*Id.*, PageID.527.) On arrival, the notes indicate she had difficulty walking, although her "baseline ambulation status [was] normal." (*Id.*, PageID.528.) Back pain was again noted. (*Id.*) But the other examination findings were normal (including strength, reflexes, senses, and range of motion), and she denied "radicular numbness or tingling," radiating pain, and "lower extremity weakness." (*Id.*) At an examination a few hours later, her walking was completely normal, as were the other findings except for the continued back pain. (*Id.*, PageID.527.) CT Scans revealed some disc protrusions and mild degenerative changes leading to mild canal stenosis at the L2-L3 disc level. (*Id.*, PageID.537.) The cause of her back pain was likely strained muscles or ligaments. (*Id.*, PageID.532.)

Respiratory problems brought her back to the hospital, where she was diagnosed with acute asthmatic bronchitis, most likely a seasonal infection. (*Id.*, PageID.539, 557.) Her examinations during the visit measured strength, tenderness, and range of motion, among other things, and found no abnormalities, although a couple examinations noted distressed breathing and another observed "[t]race pitting lower extremity edema." (*Id.*, PageID.540-44, 550, 552, 556-58.) While at the hospital, tests incidentally revealed she had thyroid goiter, although "clinically she is euthyroid," (*id.*, PageID.558, 571, 574), which is medical mumbo jumbo meaning that her thyroid worked normally, 1 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder*, E-229 (2013). Additional chest and abdomen scans in 2013 and 2014 were largely unremarkable. (*Id.*, PageID.606-18.)

An MRI from August 2013 showed "degenerative disc disease of the lower lumbar spine most pronounced on the left at the L4-L5 level where there is left lateral disc

7

herniation." (*Id.*, PageID.581.) That month, she was treated in the emergency room for a pinched nerve. (*Id.*, PageID.592.) The discharge paperwork explained that a pinched nerve, also called lumbar radiculopathy, "is caused by irritation or pressure on the nerve that goes from the spinal cord to the leg." (*Id.*) Despite the pain, her gait was normal and she was ambulatory when she departed. (*Id.*, PageID.597-98.) A doctor wrote that Balknight wanted "pain control," although there had been "no acute change in sx [*i.e.*, symptoms] and no neuro deficits." (*Id.*, PageID.601.) The notes also mention that after her MRI she had been referred to "NS," who "refused surgery because of obesity." (*Id.*, PageID.599.) Aside from back pain evidenced by tenderness and a positive straight leg raise test,[2] she denied problems with her musculoskeletal and neurological systems, and the physical examination found none. (*Id.*, PageID.599-600.)

Dr. Sunita Tummala conducted neurological evaluations of Balknight in April and July 2014. (*Id.*, PageID.649, 651.) To Dr. Tummala, she appeared in "obvious pain." (*Id.*) But the results from the neurological examination were normal, as were her strength, (except for a "4/5" rating for her left hip flexor), muscle tone, reflexes, and gait. (*Id.*, PageID.649-50.) As for her sensory system, in April Balknight experienced "[d]iminished sensation over the median sensory dermatomes" and positive Phalen's and Tinnel's signs; in July, she had "[p]atchy sensory loss over the right leg." (*Id.*, PageID.649, 651.) For

---

[2] "A straight leg raise is positive if pain in the sciatic distribution is reproduced between 30 [degrees] and 70 [degrees] . . . ." Cathy Speed, *ABC of Rheumatology: Low Back Pain*, 328 Brit. Med. J. 1119, 1120 (2004).

treatment, Dr. Tummala recommended pain medication and weight loss, among other things. (*Id.*, PageID.650.)

Balknight continued to see Dr. Tummala through 2017. (*Id.*, PageID.1060-67, 1880-87.) During these visits, Balknight complained of depression, back pain, headaches, foot pain, and sensory disturbances in her hands and feet. (*Id.*, PageID.1060, 1062, 1066.) On examination, a few times her speech was slow and she had patchy sensory loss in her right leg, (*id.*, PageID.1064, 1066); but no other neurological findings were flagged as abnormal, she had full strength (except her left hip flexor), her muscle bulk and tone were normal, her gait (including heel, toe, and tandem gait) were normal, her reflexes were fine, "[r]apid alternating . . . movements [were] intact," and no "finger-to-nose or heel-to-shin dysmetria" were noted. (*Id.*, PageID.1064, 1066; *id.*, PageID.1060 (same except no mention of hip flexor, rapid alternating movements, or dysmetria), 1062 (same).) Nerve conduction studies in May 2014 showed reduced or absent sensory responses, which Dr. Tummala interpreted as abnormal and as evidence of "generalized axonal sensorimotor prefer neuropathy." (*Id.*, PageID.1460.) In May 2015, Balknight stated that weight loss was a struggle because her back pain prevented exercise. (*Id.*, PageID.1064.) At a more recent appointment, in February 2017, Balknight continued to complain of bearing "a great deal of pain related to her neuropathy and left leg," although her Neurontin effectively managed her neuropathy (but not her leg pain). (*Id.*, PageID.1877.) During the examination, her motor functioning was normal, she had full strength "in all groups," she experienced "patchy sensory loss in a nondermatomal distribution," her reflexes were normal, her gait (including casual, heel, toe, and tandem gait) were normal, and the Romberg test—which

measures loss of postural control due to deficits in the legs, Gordon F. G. Findlay, *et al.*, *Does Walking Change the Romberg Sign?*, 18 Euro. Spine J. 1528, 1528 (2009)—was normal. (*Id.*, PageID.1877).

She was once again in the emergency room for back pain, in July 2014, apparently after a fall. (*Id.*, PageID.639, 641.) Her back was tender on examination and had decreased range of motion. (*Id.*, PageID.643.) Otherwise, she denied problems with musculoskeletal and neurological functioning and her examination results were fine—*i.e.*, normal strength, reflexes, gait, sensation, and negative straight-leg-raise test. (*Id.*, PageID.639, 642-43.) An imaging study around that time showed mild to moderate stenosis and foraminal narrowing at the L2-L3 disc level, disc bulge and mild to moderate foraminal narrowing at the L4-L5 level, possible "partial impression on the exiting left L4 nerve root," and mild stenosis due to epidural fat at the L5-S1 level. (*Id.*, PageID.605, 647.)

The following month, Balknight made another visit to the emergency room due to back pain and spasms. (*Id.*, PageID.667.) The pain was mild and radiated to her lower leg. (*Id.*, PageID.670.) But according to the intakes, it resulted in no functional limitations and, indeed, she denied any other issues. (*Id.*) On initial examination, her motor functioning and sensation were normal. (*Id.*, PageID.667.) A later examination confirmed tenderness but otherwise uncovered no abnormalities, *e.g.*, her strength was normal, her extremities had normal range of motion, her gait was normal, her reflexes were normal, and her sensation was normal too. (*Id.*, PageID.671.) When she left the hospital, she walked without difficulty. (*Id.*, PageID.668.)

10

The next trip to the emergency room, in September 2014, was for a rash. (*Id.*, PageID.688.) Aside from that issue, however, she had no other complaints and her examination results were normal, including her gait, musculoskeletal system, her motor functioning, and her sensation. (*Id.*, PageID.688, 690-91.) Less than two weeks later, her stomach became upset after she took medications without eating. (*Id.*, PageID.698.) No other complaints (besides anxiety and shortness of breath) were noted. (*Id.*, PageID.705, 708, 711.) Her physical examination was normal, as she had full range of motion with her back, no tenderness in her back or (by the end of her visit) stomach, and normal strength, sensation, and reflexes. (*Id.*, PageID.698-99, 706, 709, 712, 717, 734-35, 737.)

From 2013 through 2014, Balknight also treated with Dr. Siva Sripada for her back pain. (*Id.*, PageID.750-83.) Balknight claimed that the back pain was severe and intensified by walking, lifting, sleeping, sitting, bending, and standing. (*Id.*, PageID.752, 754, 756, 758, 762, 764, 772, 774, 776, 778, 780, 782, 1837, 1869, 1874; *see also id.*, PageID.1843 (complaining of back pain, weakness, painful or stiff joints, leg pain, but no neck pain).) Her mood had also darkened, her relationships deteriorated, and sleep proved difficult. (*Id.*) But she usually denied new weaknesses or numbness. (*Id.*, PageID.755, 759, 765, 775, 777, 779, 781, 783; *but see id.*, PageID.757, 773.) In more thorough reports of her symptoms during fall 2014 appointments, Balknight denied, among other things, weakness, "[t]iredness," difficulty sleeping, leg pain, loss of coordination, sensation problems depression, dizziness, and problems thinking or with memory. (*Id.*, PageID.750-51, 753.)[3]

---

[3] No one has called these reports' accuracy into question, but I would note that they also stated Balknight denied back pain, which is contradicted earlier in the same reports. (*Id.*, PageID.750, 752.)

During their sessions, Dr. Sripada found some back tenderness but no focal deficits or other abnormalities. (*Id.*, PageID.776, 778, 780, 782.) Balknight received injections, which provided little relief, and medications. (*Id.*, PageID.76-61, 764, 766-71, 1867, 1871-73.) In August 2014, her insurance stopped covering her injections. (*Id.*, PageID.1837.) Dr. Sripada thought that "weight loss would be very beneficial," as "there is only so much I can achieve with medication management." (*Id.*, PageID.780; *see also id.*, PageID.756, 762, 772, 774, 778, 782, 1866.) In March 2014, the notes stated, "Ms. Balknight understands clearly that weight loss is the solution to her problems. She has already been evaluated by a surgeon and no recommendations are being made surgically because of her weight." (*Id.*, PageID.764.) A few months later, the notes reported, "She needs to have surgery, but her weight is a mitigating factor . . . ." (*Id.*, PageID.758.)

Through 2016, Balknight continued receiving treatment from providers at Dr. Sripada's office. (*Id.*, PageID.1794-828.) In February 2015, she acknowledged that her weight contributed to her pain. (*Id.*, PageID.1827.) She also stated that Oxycodone was "somewhat controlling her pain." (*Id.*) On examination, she had tenderness in her lower back and positive straight leg raises; but her "[s]trength and sensation are preserved in the bilateral lower extremities." (*Id.*, PageID.1828.) Subsequent examinations were similar, and on some her deep tendon reflexes were not full, although at times the positive straight leg test results were "mild" or only on one side. (*Id.*, PageID.1818, 1825.) At some point, she began receiving injections again, which temporarily provided up to 100 percent relief, although often less (usually 20 to 70 percent); her medications, she noted at another time, gave up to 40 percent relief. (*Id.*, PageID.1794, 1797, 1798, 1800, 1805, 1809, 1812, 1814,

1817.)[4] Later, she stated that "Percocet does help with her activities of daily life, but prolonged standing, sitting and lying flat contributes to exacerbating the pain." (*Id.*, PageID.1804.) In June 2015, she noted her depression and told the medical provider that "she spends the majority of her time in the house." (*Id.*, PageID.1815.)

From 2014 to 2015, Balknight saw Dr. Khaled Shukairy. (*Id.*, PageID.808-20.) She complained about various ailments, including reflux and sinusitis. (*Id.*, PageID.808, 811.) Often, she denied shortness of breath, neck pain, neck stiffness, muscle pain, and muscle weakness. (*Id.*, PageID.808, 811, 814, 816-19.) On occasion, she claimed to experience dizziness, (*id.*, PageID.808, 814, 819), but on others she denied it, (*id.*, PageID.811). Results from physical examinations showed normal gait, orientation, and posture. (*Id.*, PageID.809, 812.) In 2014, Dr. Shukairy operated on Balknight to remove vocal-chord polyps. (*Id.*, PageID.800, 814, 816.)

The record also contains medical reports from Hamilton Community Health Network (usually signed by Dr. Donald Robinson) spanning from 2013 through 2016. (*Id.*, PageID.823-906, 1597-1783.) In them, she complained of back pain, numbness, weakness, sensation loss, fatigue, or decreased mobility, and occasionally depression. (*Id.*, PageID.842, 852, 863, 869, 874, 886, 891, 895-96, 901, 1728-29, 1755-56; *but see id.*, PageID.1603 (denying fatigue and weakness), 1629 (same), 1635 (same), 1647 (same), 1653 (same), 1658 (same), 1663 (same); 1687-88 (same), 1695 (same), 1701 (same); *see*

---

[4] In September 2015, a nurse practitioner realized Balknight had been receiving prescriptions for Norco from two providers. (*Id.*, PageID.1807.) If that continued, "she would be discharged from the practice," the nurse claimed. (*Id.*)

*also id.*, PageID.1599 (denying fatigue), 1622 (same), 1642 (same), 1687-88 (same), 1695 (same), 1715 (same), 1722 (same), 1735 (same), 1740 (same), 1745 (same) 1750 (same), 1755 (same), 1769 (same), 1775 (same), 1781 (same).) The physical examinations sometimes revealed muscle spasms or tenderness, but she often appeared properly oriented, alert, cooperative, and with "normal attention span and concentration," her neck was supple, or her extremities had normal mobility, (*Id.*, PageID.825, 834, 857, 863-64, 869-70, 874-75, 879-80, 887, 891-92, 896, 902, 1600, 1604, 1622-23, 1636, 1643, 1648, 1654, 1659, 1664, 1696, 1702, 1723, 1729, 1741, 1750-51, 1770, 1775-76, 1781; *see also id.*, PageID.852-53 (same except no report on extremity mobility), 842-43 (same except no report on extremity mobility or orientation); 1715 (same except anxious and no mention of attention span, concentration, orientation, alertness, or cooperation); 1745 (same except depressed affect and no mention of attention span, concentration, orientation, alertness, or cooperation), 1762 (no abnormalities flagged).) The examination results at other appointments, however, showed joint tenderness, undescribed weakness, joint swelling, edema, depression, or decreased range of motion. (*Id.*, PageID.843, 848, 852-53, 863-64, 870, 875, 880, 887, 902, 1630, 1688, 1709-10, 1736, 1741, 1756, 1770, 1781.) In February 2015, a note states that she was "still unable to have back surgery secondary to her inability to lose 60+ pounds." (*Id.*, PageID.868.) The notes also indicate that, at least as of October 2014, she spent 16 to 24 hours a day watching television, on a computer, or playing games. (*Id.*, PageID.1694.)

A sleep study in February 2015 revealed a "[m]ild case of obstructive sleep apnea and hypopnea." (*Id.*, PageID.908.)

14

In May 2015, Dr. Matthew Dickson conducted a psychiatric evaluation. (*Id.*, PageID.910-13.) Balknight claimed to suffer depression, but acknowledged she had never received mental health services. (*Id.*, PageID.910.) Social interactions were limited because she did not "like people right now." (*Id.*, PageID.911.) Though she used to like "going out," she currently had no hobbies. (*Id.*) Most days were spent "in the bed waiting for the day to be over." (*Id.*) Household chores were too much to handle, and a relative thus took care of the house. (*Id.*) She took brief shopping trips and could drive. (*Id.*) Scheduling and managing appointments were tasks she could do unassisted, and she could also pay bills. (*Id.*) Dr. Dickinson noticed Balknight's low energy level and general discouragement, but did not detect any cognitive impairment or problems with focus or concentration. (*Id.*) Overall, Dr. Dickinson concluded that her "mental abilities to understand, attend to, remember, and carry out instructions of work-related behaviors are not impaired," although she had a mild impairment in responding appropriately to co-workers and supervisors and adapting to work place changes. (*Id.*, PageID.912.)

At her next trip to the emergency department, in April 2015, she complained of sharp back pain radiating to her leg. (*Id.*, PageID.927.) Yet, the pain imposed no functional limitations (such as a wayward gait or inability to do activities of daily living). (*Id.*) No other signs or symptoms were noted. (*Id.*) While her back was tender on examination, all other relevant measures were normal. (*Id.*, PageID.928, 931.)

At a May 2015 consultative evaluation with Dr. Samiullah Sayyid, Balknight noted her history of back pain and other impairments. (*Id.*, PageID.916.) On examination, her neck was supple, she had no motor or sensory deficits, "[t]here was some paresthesia on

the tips of the fingers and toes," her "[d]eep tendon reflexes are lost altogether in both upper and lower extremities," her finger-to-nose test was normal, she could not rapidly alternate her hand movements, her cervical spine was normal with full range of motion, her lumbosacral spine was tender with limited movement, her joints were normal with full ranges of motion except her hips and wrists, she had fine and gross dexterity in her arms, her grip was normal, her gait was normal, she struggled to get on and off the table, and she could not squat or walk on her heels and toes. (*Id.*, PageID.917-18.) In a supplemental report, Dr. Sayyid noted that Balknight could carry, push, and pull less than ten pounds, and could sit, stand, dress, dial a phone, open a door, make a fist, pick up a coin, pick up a pencil, write, touch finger to finger, and touch finger to nose. (*Id.*, PageID.919.)

Her next trip to the emergency room, in May 2015, was for a wrist sprain. (*Id.*, PageID.943.) On arrival, she noted the pain occurred when she awoke; the intake report also observed that she could move her fingers and wrist without difficulty and no swelling, redness, or bruising was seen. (*Id.*) She also "denie[d] changes in sensation or strength." (*Id.*, PageID.944.) The only abnormality seen during the physical examination was tenderness in her wrist, which retained full range of motion and sensation. (*Id.*, PageID.944-45.) She walked without assistance, and her back, arms, and legs had full range of movement and all had full range of motion except her right arm, which was "[l]imited." (*Id.*, PageID.954-55.)

At the next month's emergency-room visit, again for back pain, she continued to deny any other symptoms, such as general weakness. (*Id.*, PageID.966.) The pain minimally limited her functioning. (*Id.*) Like the last visit, her physical examination results

16

were normal (including normal strength and sensation) and her back was tender; however, one report claimed her gait was antalgic, *i.e.*, pain-avoiding, while another observed it was normal. (*Id.*, PageID.967, 970.)

An imaging study completed in June 2015 found the following: the L2-L3 level had "bulging disc and hypertrophic changes of the posterior elements mild canal," the L3-L4 level had "severe right and moderate left-sided foraminal stenosis" with probable right L3 nerve-root impingement, the L4-L5 level had "bulging disc and facet hypertrophy with severe bilateral foraminal stenosis" with "bilateral L4 nerve root impingement," and the L5-S1 level had "bulging disc and facet hypertrophy with mild right-sided foraminal stenosis." (*Id.*, PageID.1515

In July 2015, a mild headache sent her to the emergency room. (*Id.*, PageID.986.) Aside from mild nausea, the intake form flagged no complaints or concerns, and the physical examination revealed none either. (*Id.*, PageID.986-87, 991.) When the pain increased to "moderate" in August, she returned to the hospital. (*Id.*, PageID.1016.) She still denied other symptoms (like numbness or weakness), but asserted she felt stiff in the mornings. (*Id.*) Her physical examination, too, was completely normal—even her back was fine, without tenderness or spasms. (*Id.*, PageID.1017, 1020.)

But a month later, in September, she saw Dr. Sudesh Ebenezer for her back pain. (*Id.*, PageID.1032.) She was tired, she claimed, and her back hurt, the pain radiated to her legs, her joints ached, her legs swelled, and she was depressed; however, she denied weakness in her limbs, difficulty sleeping, loss of balance, loss of coordination, loss of sensation, and "[p]roblems with [t]hinking." (*Id.*, PageID.1033.) No examination notes

17

were memorialized, but Dr. Ebenezer mentioned that operating on Balknight's mild disc herniation at the L4-L5 level "will not likely help her axial low back pain. It could help her left leg radiculopathy however the results of the surgery due to her weight might be in the order of 50%." (*Id.*, PageID.1032.)

In November 2015, a dental infection and a cold caused a return to the emergency room. (*Id.*, PageID.1036-37.) Aside from a cough and pain, no other symptoms were present—among other things, she denied musculoskeletal pain and stiffness, and sensation problems—and none were found on examination. (*Id.*, PageID.1040-41, 1044.)

At the end of 2015, Balknight saw Dr. Ali Karrar at a rheumatology clinic. (*Id.*, PageID.1589.) At the examination, Balknight's hands and knees were tender to the touch, but her gait was normal, "her neck had full range of motion without pain," her thyroid was not enlarged, her higher neurologic functions and cranial nerves were grossly normal, and her motor examination (including "tone, power and nutrition of the muscles"). (*Id.*, PageID.1590.) Dr. Karrar recommended aerobic exercises and weight loss. (*Id.*, PageID.1591.) Later examinations produced similar results, and the recommendation often remained the same. (*Id.*, PageID.1573-74, 1577-78, 1585, 1587.) The findings from the July 2016 examination included, in addition to the above, negative Tinnel's and Phalen's tests and full range of motion in her wrists. (*Id.*, PageID.1564; *see also id.*, PageID.1561 (same).) In September 2016, she told Dr. Karrar that her lupus symptoms—including fatigue and joint pain and stiffness—were improving with treatment and (partially) with medication. (*Id.*, PageID.1560, 1945; *see also id.*, PageID.1556 (same).) Two months later, her examination results remained the same—with negative Tinnel's and Phalen's and full

18

wrist motion—and Dr. Karrar also observed that she sat "comfortably on the examination table without difficulty or evidence of pain." (*Id.*, PageID.1557-58; *id.*, PageID.1552-53 (same for February 2017), 1946-47 (same for May 2017).)

During an office visit in January 2016 to treat her diabetes, she denied fatigue, lightheadedness, shortness of breath, anxiety, mental problems, and depression, among other things; she did, however, complain of joint pain. (*Id.*, PageID.1519.) The examination confirmed joint tenderness, but her extremities had normal mobility, she was cooperative, and her attention and concentration were normal. (*Id.*, PageID.1520.) Later the same month, she had nausea, a headache, nasal congestion, a cough, and sore throat, in addition to other symptoms. (*Id.*, PageID.1524.) At that time, she felt weak and complained of back and joint pain. (*Id.*, PageID.1520.) Her extremities, however, had normal mobility and her mood, concentration, and attention span were all normal, though joint tenderness was produced on examination. (*Id.*, PageID.1526, 1531.)

At the emergency room in April 2016, her back pain caused an antalgic gait. (*Id.*, PageID.1076.) Yet, the "Morse Fall Scale" report during the visit stated she had normal gait. (*Id.*, PageID.1080.) No other functional limitations were associated with the pain (it was not marked, for example, that she was unable to do activities of daily living). (*Id.*, PageID.1076, 1080.) And no other symptoms were noted or problems mentioned. (*Id.*, PageID.1076.) The examination revealed anxiety and back and thigh tenderness; the results were otherwise normal. (*Id.*, PageID.1077.)

A month after this visit, she returned with "itching, burning, and hurting all over." (*Id.*, PageID.1091.) But she did not complain of other problems, nor did the physical

19

examination uncover any. (*Id.*, PageID.1092.) She arrived walking, without assistance, and was cooperative. (*Id.*, PageID.1113.) The rash persisted until a few days later, leading to another visit to the emergency room. (*Id.*, PageID.1124.) Again, however, she denied other issues and none were found on examination, which revealed normal range of motion for her neck and musculoskeletal system and normal neurological findings. (*Id.*, PageID.1125-26.)

Psychiatric treatment notes span from August 2015 through July 2016. (*Id.*, PageID.1152-74.) She recounted years' long depression, crying spells, and days spent sleeping. (*Id.*, PageID.1174.) But she had no treatment history. (*Id.*, PageID.1170.) In the intake records, she noted neurological pain and lupus, but denied all other medical issues, including with her cardiovascular and muscular systems. (*Id.*, PageID.1171.) The first examination showed Balknight to be cooperative and have coherent speech, mild dysphoria, unremarkable psychomotor behavior, normal muscle tone, normal gait, appropriate attention and concentration, intact memory, intact thought process, appropriate thought content (although with obsessions), full orientation, an adequate fund of knowledge, and impulsive judgment. (*Id.*, PageID.1172.) At a later visit, she appeared calm and euthymic, with appropriate affect, appropriate speech rate and volume, unremarkable psychomotor behavior, normal muscle tone, normal gait, appropriate attention and concentration, intact memory, appropriate thought content (without obsessions), full orientation, an adequate fund of knowledge, and appropriate judgment (no longer impulsive). (*Id.*, PageID.1168-69; *see also id.*, PageID.1152-53, 1158-59.) Sometimes, her obsessions and impulsivity returned (even when her overall thought content and judgment

remained appropriate); otherwise the other examination results were the same. (*Id.*, PageID.1163-64.)

An ambulance brought Balknight to the emergency room in August 2016 when pain from her wisdom tooth extraction did not abate. (*Id.*, PageID.1177, 1179.) She denied other issues and the examination results showed her neck and musculoskeletal system had normal ranges of motion; no other abnormalities were flagged. (*Id.*, PageID.1180-81.)

Her chief complaint in the emergency room in October 2016 was a cough, coupled with congestion and headaches. (*Id.*, PageID.1199.) The problems had lasted for two or three days despite her taking over-the-counter medications. (*Id.*, PageID.1200.) She also mentioned joint pain, but denied back pain, joint swelling, and confusion. (*Id.*; *see also id.*, PageID.1204, 1207.) On examination, her neck had normal range of motion, her cardiovascular system was normal, she exhibited no edema, her muscle tone and neurological system were normal, and her mood and affect were normal. (*Id.*, PageID.1201, 1204-05, 1208.) According to the notes, her symptoms likely stemmed from "a viral infection causing her lupus to flare." (*Id.*, PageID.1202.)

Later that month she saw Dr. Rudrum Muppuri for back and leg pain and peripheral neuropathy. (*Id.*, PageID.1238.) Also, she had some weakness and numbness in her legs. (*Id.*) But her leg strength was normal during the examination, her sensation was "grossly intact except decreased sensation on the left lower extremity compared to the right side up to the ankle area," and her range of motion was normal. (*Id.*, PageID.1239.) Tenderness was present on examination. (*Id.*) Dr. Muppuri advised Balknight to quit smoking and lose

weight, which would help with her back and leg pain. (*Id.*, PageID.1240.) He also scheduled injection treatments and prescribed narcotics. (*Id.*)

At the appointments for injections, Balknight repeated many of her complaints. (*Id.*, PageID.1268, 1358.) After one set of injections, the notes state her pain control was "satisfactory," and after others the record indicates she was properly oriented, calm, in no pain, and had no limitations on mobility. (*Id.*, PageID.1273, 1395, 1449.) After receiving some of the injections, Balknight followed-up in January 2017, regarding her joint and back pain. (*Id.*, PageID.1342.) The injections provided 60 percent pain relief for two weeks. (*Id.*) But her pain continued. (*Id.*, PageID.1344.) No new weaknesses had occurred, and she denied dizziness, shortness of breath, and nausea, among other symptoms. (*Id.*, PageID.1342.) The physician found Balknight's neck supple, bending with her lumbar spine was reduced, extending with her lumbar spine was not limited, and she had some tenderness in her joints and back, decreased leg strength, normal neurological results, and a negative straight leg raise test. (*Id.*)

In the last half of 2016 and into 2017, Balknight received treatment for various issues at the Genesee Community Health Center. (*Id.*, PageID.1463-1511.) In the sessions, she claimed to suffer from depression, sleep problems, and difficulty concentrating. (*Id.*, PageID.1483, 1508-09.) She denied fatigue, dizziness, and gait disturbance. (*Id.*, PageID.1502, 1509.) Some of these same records (and others), however, also state that her lupus caused dizziness and fatigue. (*Id.*, PageID.1477, 1484, 1489, 1495, 1506.) On examination, Balknight typically had proper orientation, appropriate mood and affect; other examinations showed negative straight leg raise tests, normal memory, normal

22

insight, normal judgment, normal cervical spine, full range of motion with her wrist and fingers, or normal gait. (*Id.*, PageID.1467, 1472, 1478, 1483, 1489, 1503.) Occasionally, her lumbar spine was tender and had mildly reduced range of motion, her gait was antalgic, or she had severe pain moving her lumbar spine. (*Id.*, PageID.1496, 1503.) One note states that Balknight reported being offered surgery for her leg pain, but it would have done nothing for her back problems and "[t]hey left the decision up to her." (*Id.*, PageID.1499.) Regarding her depression, she reported in March 2017 that it persisted but was improving. (*Id.*, PageID.1930.) At that appointment, the provider observed Balknight took high doses of medications and planned to reduce one of them; the risk of overdose was "great," and Balknight appeared oversedated from the medications. (*Id.*, PageID.1930-31.)

In January 2017, Balknight saw an endocrinologist, Dr. Hement T. Thawani. (*Id.*, PageID.1547.) The examination revealed a minimally enlarged thyroid but no leg edema or gross neurological focal deficits. (*Id.*) Again in April, her thyroid was mildly enlarged and she had no pitting leg edema. (*Id.*, PageID.1883.) At that appointment, Dr. Thawani told her that injection therapy "is not a definitive cure for her problem," and that she needed "to walk for five minutes three times a day if tolerated" and continue her present medications. (*Id.*)

A report from May 2017 noted that recent injections provided "good relief for 2-3 weeks." (*Id.*, PageID.1891.) She denied shortness of breath, nausea, and dizziness, among other things. (*Id.*) On examination, her lumbar spine had full range of motion on extension but reduced range on bending; she had lumbar and sacroiliac joint tenderness, positive lumbar facet loading, negative straight leg raise test, positive Patrick's test (to measure hip,

lumbar spine, or sacroiliac joint pathologies),[5] decreased leg strength, and grossly intact cranial nerves with no focal deficits.[6]

### 2.    Function reports

Balknight filled out a function report in February 2015. (*Id.*, PageID.436-43.) In it, she claimed that she could neither sit nor walk for long periods. (*Id.*, PageID.436.) She wrote that she could, however, "sit in the same position for long." (*Id.*) Pain caused her to remain in bed 90 percent of the time; cooking or cleaning caused severe pain. (*Id.*) She left the house only for doctors' appointments. (*Id.*, PageID.437.) While she was responsible for a daughter and dogs, the former took care of the latter and a chore provider helped with everything. (*Id.*) Sleep was disrupted due to pain. (*Id.*) Putting on socks and shoes, caring for her hair, and (sometimes) bathing were affected by her condition. (*Id.*) And she could not prepare meals because she was unable to stand up or grip items without dropping them. (*Id.*, PageID.438.) She did no work around the house. (*Id.*)

When she left the house, it was usually for a doctor's appointment. (*Id.*, PageID.439.) She could ride in cars, but seldom drove. (*Id.*) She never shopped, but she could handle money. (*Id.*) She had no hobbies—the pain prevented her from doing "what

---

[5] *See* Jennifer J. Bagwell, *et al.*, *The Reliability of FABER Test Hip Range of Motion Measurements*, 11 Int'l J. of Sports Physical Therapy, 1101, 1102 (Dec. 2016).

[6] Balknight submitted evidence to the Appeals Council that was not presented to the ALJ. (*Id.*, PageID.57, 71-74.) In the Sixth Circuit, when the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. See *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the final decision of the Commissioner, 42 U.S.C. § 405(g), and the final decision is the ALJ's when the Council denies review, 20 C.F.R. § 404.955, the court can consider only evidence presented to the ALJ.

I use[d] to" and she no longer "care[d] about anything." (*Id.*, PageID.440.) Her social life consisted of talking to her fiancé and family, but she did this only about three times a week. (*Id.*, PageID.440.)

Her impairments affected the following abilities: lifting (she was limited to 5 pounds), squatting, bending, standing, walking (for only 15 minutes before resting), sitting, kneeling, climbing stairs, seeing, completing tasks, using her hands, and getting along with others. (*Id.*, PageID.441.) She could pay attention for 30 minutes; as for following instructions, written ones made her sleepy, but she could understand verbal orders and she got along well with authority figures. (*Id.*, PageID.441-42.) To help walk, she used crutches, a walker, a wheelchair, a cane (when she left the house), and a brace (at night). (*Id.*, PageID.442.) Her medications—a lengthy list—caused drowsiness and dizziness. (*Id.*, PageID.443.)

### 3.    Balknight's Administrative Hearing Testimony

At the July 31, 2017 hearing, Balknight testified that she drove about once a week, though not for long trips because she struggled to sit. (*Id.*, PageID.115-16.) Sometime in 2013, she was self-employed as a childcare provider for her nephew, who had been about eight or nine years old at the time. (*Id.*, PageID.117.) Before that, she had worked some in 2011 and, even earlier, as a part-time teacher's helper—"a substituting job," she explained—with Flint Community Schools. (*Id.*, PageID.118.) Part of her duties required restraining and tutoring students. (*Id.*, PageID.118-19.)

Her pain centered on the mid-back and tailbone, radiating through her hips and her right leg down to her toes. (*Id.*, PageID.121-22.) Both hands and knees hurt too, as well as

her neck and (intermittently) her shoulder. (*Id.*, PageID.122.) Pain was constant, exacerbated by standing, sitting, or lying down for long periods. (*Id.*, PageID.123.) Nothing helped relieve the pain—not even changing positions. (*Id.*) After ten minutes sitting or five minutes standing, however, she needed to shift positions. (*Id.*, PageID.123-24.) She could not walk at all, she claimed, before clarifying that at most she could "do maybe a half of a half a block." (*Id.*, PageID.124.) Any longer and her legs and back would ache, forcing her to sit on the ground. (*Id.*) Lifting pop bottles or milk jugs was impossible, though she could button, zip, and dress, "[f]or the most part." (*Id.*)

Opening shut doors was difficult if the knob was hard to turn or stuck. (*Id.*, PageID.125.) And she could not open jars. (*Id.*) Assistance was needed for bathing, dressing, and cooking. (*Id.*) A chore provider had, for the past five or so years, helped with these tasks. (*Id.*, PageID.125, 131.) She did not cook, clean dishes, do laundry, shovel snow, shop for groceries, attend social organizations, or have hobbies. (*Id.*, PageID.126.) Her hands had become claw-like due to lupus and carpal tunnel. (*Id.*, PageID.132.) She could extend her fingers but not do any fine motor skills, like writing, with her hands. (*Id.*) She could not, for example, "pick up things and sometimes they drop outside my hand." (*Id.*) True, she admitted, she had said she could pick up a coin, but most of the times it fell. (*Id.*) Her dominant hand, the right, was worse than the other. (*Id.*) As for her shoulders, she did not even try raising them because it hurt too much. (*Id.*, PageID.133.)

She also suffered from psoriasis, which in addition to pain and itching caused her embarrassment. (*Id.*) The rashes had spread throughout her body. (*Id.*) And when she left the house, she had "to be covered from head to toe." (*Id.*, PageID.134.) The lupus, too, was

affected by sunlight. (*Id.*, PageID.134.) When it was too bright out, her lupus bothered her "if I don't have no shades on, sometimes when I do, I get migraines, real bad migraines," about three or four times a week. (*Id.*) If she took her migraine medicine right away, the pain lasted only three or four hours; otherwise, it plagued her for seven to eight. (*Id.*, PageID.135.) Her lupus caused a hot "gummy feeling," that occurred four times a week, lasting five to six hours each time. (*Id.*, PageID.135-36.) Itchy welts formed four or five days a week, due to her psoriasis. (*Id.*, PageID.136.) Finally, the lupus and psoriasis caused her hair to fall out. (*Id.*)

On a typical day, she did nothing except "play a game or two on my phone" and listen to gospels. (*Id.*, PageID.127.) Most her day was spent in bed, and sometimes on a massaging mat. (*Id.*, PageID.130-31.)

The spinal injections offered no relief whatsoever, even temporarily. (*Id.*, PageID.127-28.) Physical therapy, which she last attended about two years prior, was too painful to continue. (*Id.*, PageID.128.) At night, she wore prescription braces on her wrists due to carpal tunnel syndrome. (*Id.*, PageID.128-29.) A cane helped her maintain balance. (*Id.*, PageID.129.)

She could "get along with people okay." (*Id.*, PageID.130.) Her concentration was "kind of off" due to a "lupus fog." (*Id.*)

### 3.    Vocational Expert's Administrative Hearing Testimony

The ALJ asked the vocational expert (VE) to

assume we're talking about a hypothetical worker of the Claimant's age, educational background, prior work experience and any acquired skills that prior work would provide for. [For] [t]he first hypothetical . . . . I want you

27

to assume a worker capable of sedentary exertional activities as defined in the regulations. I would also ask you to assume that our worker is going to require the opportunity to alternate position for up to five minutes out of every 30 minutes. There should be no climbing of ladders or stairs, occasional stooping, no kneeling, crouching or crawling. Our worker is limited to frequently handling, fingers and feeling. There should be no exposure to hazards. which I would assume would include such things as unprotected heights and hazardous machinery, and no exposure to vibration. There should be no use of foot or leg controls, no concentrated exposure to fumes, dust, gases, no exposure to extremes of temperature or humidity. Our worker is limited to simple, routine, repetitive work and she should be able to wear an orthopedic boot while working.

(*Id.*, PageID.138-39.) Such an individual, the VE testified, could do the following work:

packager (40,000 positions); administrative support clerk (220,000); and sorter (25,000).

(*Id.*, PageID.139.)

For the next hypothetical, the ALJ asked the VE to "add that the work must allow

for the use of a handheld assistive device at all times when walking but not required when

standing at the work station. And the contralateral upper extremity may be used to lift and

carry up to the exertional limitations. And there should be no overhead reaching." (*Id.*) The

individual could perform the same jobs in the same numbers as above, the VE testified.

(*Id.*, PageID.140.) Next, the ALJ assumed all the limitations above and added that the

handheld device "must be able to be used at all times when standing or walking and the

contralateral upper extremity may be used to lift and carry up to the exertional limitations.

So when standing, the worker would be limited to one handed work." (*Id.*) No jobs would

be available for that individual, the VE concluded. (*Id.*) Nor could the person work if he or

she would be off task 20 percent of the workday (in excess of regularly scheduled breaks).

(*Id.*) And the individual would also be precluded from work if he or she would miss three or more days a month. (*Id.*)

Balknight's representative then asked the VE to consider how changing the first and second hypothetical individual's limitation from frequent handling, fingering and feeling to occasional. (*Id.*, PageID.141.) That would limit the available job base to 30,000 administrative support clerks, the VE responded. (*Id.*) Somewhat confusingly, however, instead of relying on the administrative support clerk position, the VE gave a new code from the Dictionary of Occupational Titles corresponding to a call-out operator. (*Id.*)

### F.    Law and Analysis

Balknight presents four arguments: (1) the ALJ erroneously considered himself bound by the earlier ALJ decision denying benefits in her prior applications; (2) the RFC lacks substantial evidence; (3) the ALJ's analysis of her subjective symptoms was flawed; and (4) the ALJ erred at step three by failing to solicit a medical opinion on whether she met or equaled a Listing. (R. 21, PageID.1969-84.)[7] Each contention will be addressed in turn.

### 1.    *Res Judicata*

The first argument involves the application of *res judicata* to Social Security proceedings. Until recently, the leading case on *res judicata* in this Circuit was *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997).[8] There, the court held that the "[w]hen the

---

[7] Balknight presents the argument in a slightly different order. I have rearranged it for clarity.

[8] As the Third Circuit has explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel, is less

Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997). The Social Security Administration then issued an Acquiescence Ruling on *Drummond*:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (June 1, 1998). This approach, in the context of closed periods of disability, meant that "*res judicata* binds the Commissioner as to the claimant's disability *during* the closed period, as well as her non-disability *after and before* the closed period." *Gaines v. Comm'r of Soc. Sec.*, No. 1:16-cv-12793, at *8 (E.D. Mich. April 4, 2017) (citation omitted), rep. & rec. adopted by 2017 WL 2117990 (E.D. Mich. May 16, 2017).

Recently the Sixth Circuit clarified the meaning of *Drummond*. In *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018), the ALJ had thought *Drummond* precluded him from revisiting an earlier finding that the claimant was not disabled unless she offered new and material evidence of a changed condition. But this belief was incorrect. Rather, the Sixth Circuit explained, "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as

---

expansive, "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Id.*

the claimant presents evidence of a change in condition or satisfies a new regulatory condition." *Id.* at 932. As such, *res judicata* does not "prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id.* at 931.

Courts applying *Earley* to ALJ decisions issued before that case—like the one here—have asked whether the ALJ, despite purporting to follow *Drummond*, gave the new evidence a fresh look. If so, then the ALJ's decision satisfied *Earley*; if not, then remand was appropriate. *See Snyder v. Comm'r of Soc. Sec.*, No. 1:17-cv-486, 2018 WL 4658813, at *3 (W.D. Mich. 2018) (finding that the pre-*Earley* ALJ decision satisfied *Earely* by "effectively re-open[ing]" the prior ALJ's decision); *Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at *3 (W.D. Mich. 2018) (reversing where the ALJ did not satisfactorily review the evidence, but rather focused on the prior RFC findings); *Cassaday v. Comm'r of Soc. Sec.*, No. 1:17-cv-630, 2018 WL 4519989, at *3 (W.D. Mich. 2018) (reversing where the ALJ's decision was not consistent with *Earley*'s requirement of independent review); *Brent v. Comm'r of Soc. Sec.*, Case No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. 2018) (holding that pre-*Earley* ALJ sufficiently conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kamphaus v. Comm'r of Soc. Sec.*, No. 2:17-cv-11828, 2018 WL 3800243, at *5 (E.D. Mich. 2018) ("It is clear to the Undersigned that ALJ Deming did not simply apply *res judicata* principles and adopt ALJ Kalt's findings 'lock, stock and barrel,' but instead gave new consideration and analysis" to the new evidence.), *Rep. & Rec. adopted*

*by* 2018 WL 3770045 (E.D. Mich. 2018); *see also Kimball v. Comm'r of Soc. Sec.*, No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *Rep. & Rec. adopted by*, 2018 WL 4095081 (E.D. Mich., 2018).[9]

Here, as noted, Balknight's prior application was denied in December 2013. (*Id.*, PageID.175, 199.) The present administrative decision was decided before *Earley*, so the ALJ relied on *Drummond* and AR 98-4. (*Id.*, PageID.78, 81-82, 84-85.) The decision accurately characterizes the law at the time, stating that the prior decision was binding unless the evidence showed Balknight's condition had deteriorated. (*Id.*, PageID.78, 84-85.) The ALJ determined that "[t]he medical evidence of record in this case does not support the conclusion that there has been a significant worsening in the claimant's condition since the prior decision." (*Id.*, PageID.85.) But the ALJ went further, canvassing the reams of new evidence Balknight presented. (*Id.*, PageID.85-91.) After thoroughly discussing the materials, the ALJ again noted his conclusion that Balknight's condition had not deteriorated. (*Id.*, PageID.91.) Importantly, he added that "independent of *Drummond*, I would not have assigned a more restrictive residual functional capacity based upon the evidence currently before me, and for the reasons stated, may have assigned a less

---

[9] One out-of-circuit court declined to apply *Earley* to a preceding ALJ decision, but did not explain why. *See Seabolt v. Berryhill*, 2018 WL 3545382, at *3 at n. 4 (N.D. Ind. July 23, 2016) (finding that "Earley had not been decided when the ALJ opined on Seabolt's case and therefore does not control this Court's analysis of the ALJ's decision"); *but see generally* Bryan A. Garner, *et al.*, *The Law of Judicial Precedent* 308-10 (2016) (noting that judicial decisions generally have retroactive effect).

restrictive residual functional capacity." (*Id.*, PageID.91.) Specifically, the ALJ noted that two of the severe impairments from the prior decision (incorporated into this decision as well), carpal tunnel and reflux, lacked much support in the current record. (*Id.*) Thus, according to the ALJ, to the extent he felt bound by the prior findings, it was to Balknight's benefit.

The question is whether the ALJ gave the new evidence a fresh look—if he did, then there is no *Earley* problem despite his application of prior caselaw. *See Johnson v. Comm'r of Soc. Sec.*, No. 2:17-cv-13126, 2018 WL 6440897, at *15 (E.D. Mich. Oct. 22, 2018), *Rep. & Rec. adopted by* 2018 WL 6434778 (E.D. Mich. Dec. 7, 2018). I conclude that the ALJ provided the necessary fresh look. For one thing, he expressly noted that absent *res judicata* he would have reached the same basic result. (*Id.*, PageID.91.)

More importantly, he sedulously trudged through the relevant record, which spanned over 1500 pages including the administrative materials. (*Id.*, PageID.85-91.) His decision examines imaging studies revealing back problems, treatments that provided occasional and partial relief, physical examination results that generally showed full strength and range of motion, some decreased sensation, normal gait, negative results on tests for carpal tunnel syndrome, and inconsistencies between her testimony and the medical record. (*Id.*, PageID.85-88.) He explained, for example, that Balknight's gait was consistently normal despite her statements in the function report that she needed a host of assistive devices to ambulate. (*Id.*, PageID.88.) The ALJ also recognized evidence of other issues, like neuropathy, but noted countervailing evidence. (*Id.*, PageID.88-89.)

The ALJ's discussion is supported by the record. Routinely, her gait, range of motion, and strength were normal on examinations, and no abnormalities other than tenderness were flagged for her musculoskeletal system; and frequently her neurological examinations were normal too. *See* (*Id.*, PageID.493-94, 497, 503, 505, 514, 516, 517, 527, 528, 540-44, 550, 552, 556-58, 599-601, 639, 642-43, 667-68, 671, 688, 690-91, 698-99, 706, 709, 712, 717, 734-35, 737, 776, 778, 780, 782, 809, 812, 825, 834, 857, 863-64, 869-70, 874-75, 879-80, 887, 891-92, 896, 902, 917-18, 928, 931, 954-55, 967, 970, 986-87, 991, 1017, 1020, 1040-41, 1044, 1060, 1062, 1064, 1066, 1077, 1092, 1125-26, 1172, 1152-53, 1158-59, 1163-64, 1168-69, 1180-81, 1201, 1204-05, 1208, 1239, 1467, 1472, 1478, 1484, 1489, 1503, 1520, 1526, 1531, 1547, 1552-53, 1557-58, 1561, 1564, 1573-74, 1577-78, 1585, 1587, 1590, 1600, 1604, 1622-23, 1636, 1643, 1648, 1654, 1659, 1664, 1696, 1702, 1723, 1729, 1741, 1750-51, 1770, 1775-76, 1781, 1818, 1825, 1828, 1877, 1946-47.) Multiple emergency-room records state that her pain imposed no or minimal functional limitations, including (sometimes) in activities of daily living. (*Id.*, PageID.927, 966, 1076.)

A few reports recorded positive straight leg raise tests, decreased strength, decreased range of motion, patchy sensory loss, or positive Tinnel's and Phalen's (for carpal tunnel) signs. *See* (*Id.*, PageID.643, 649, 651, 843, 848, 852-53, 863-64, 870, 875, 880, 887, 902, 917-18, 955, 1064, 1066, 1342, 1460, 1496, 1630, 1688, 1709-10, 1736, 1741, 1756, 1770, 1781, 1877, 1891.) But as the ALJ stated, tests for carpal tunnel syndrome were often negative, (*id.*, PageID.1552-53, 1557-58, 1561, 1564, 1946-47), and when she went to the emergency room for her wrist, she moved it without difficulty and denied sensation or

strength deficits (and none were found on examination), (*id.*, PageID.944-45; *see also id.*, PageID.1484 (normal wrist movement)). She also had negative straight leg raise tests. (*Id.*, PageID.643, 1342, 1473). Additionally, the degree or nature of the strength loss was not described. And on the rare occasions she had trouble walking, the medical notes were equivocal. *See* (*Id.*, PageID.527-28 (noting difficulty walking but that her "baseline ambulation status [was] normal," and later her walking was normal), 967, 970, 1076, 1080.) As for the other records showing some deficits, the ALJ was not obligated to credit them over the substantial evidence cited above supporting his conclusion.

Balknight suggests that the ALJ's decision glossed over diagnostic studies, which according to her provide evidence of deterioration. (R. 21, PageID.1970.) The statement Balknight takes issue with is the ALJ's comment that "[w]hile the claimant's representative asserts that there appears to be greater findings on MRI more recently as compared to a prior MRI, such findings alone do not support a conclusion of significant worsening." (R. 16, PageID.91.) Though the ALJ did not say which MRI he referred to, Balknight claims it was from June 2015, showing among other things, bulging discs, foraminal stenosis, and nerve root impingement. (R. 21, PageID.1970 (citing R. 16, PageID.1514-15).)

Balknight argues that "[d]etermining that the findings on a more recent MRI did not support a conclusion of worsening is a medical finding reserved for a physician." (R. 21, PageID.1970.) For support, she cites a Sixth Circuit decision noting that medical opinions are defined in the regulations "as 'statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she]

can still do despite impairment(s), and [her] physical or mental restrictions.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting 20 C.F.R. §§ 404.1527(a)(2) and 416.972(a)(2)). The ALJ, the court explained, must weigh these opinions based on "the qualifications of the experts, the opinions' reasoning, their reliance on objectively determinable symptoms and established science, their detail of analysis, and their freedom from irrelevant distractions and prejudices." *Id.* (citation omitted). But when the opinion comes from a treating physician and is supported by medical evidence, the ALJ cannot substitute his or her own opinion. *Id.* That is precisely what the ALJ did in *Simpson*, rejecting a treating source's opinion as implausible. *Id.*

But *Simpson* is a far cry from this case. To the extent that the raw imaging results even constitute a medical opinion, Balknight does not suggest that it came from a treating source, as in *Simpson*. In any event, the ALJ here did not overstep his bounds by observing that a lone MRI was insufficient to establish Balknight's claim of deterioration. And that is all the ALJ said. He did not claim that the MRI showed no deterioration or was unhelpful to Balknight; he merely noted that it was not "alone" enough to carry the day for her. The ALJ did not attempt to interpret the MRI or use it to build functional limitations.[10]

---

[10] Balknight cites a second case as well, for the proposition that an ALJ cannot translate raw medical data into functional limitations without expert guidance. (R. 21, PageID.1970 (citing *Isaacs v. Astrue*, No. 1:08-CV-00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) ("[T]he ALJ may not interpret raw medical data in functional terms." (citation omitted)). *Isaacs* reversed an ALJ's decision because he constructed an RFC based on bare medical data. The ALJ here did no such thing. The statement that Balknight objects to did not suggest any functional limitations. The ALJ simply said the MRI could not "alone" show deterioration. And as noted above, this statement does not mean that the ALJ concluded the MRI failed to show deterioration; it simply suggests that more evidence would be necessary. This is reasonable—certainly, Balknight does not argue that the MRI could, without more, demonstrate such significant worsening that she is entitled to benefits.

Next, Balknight cites other evidence that she expressly stated her condition worsened. She notes that her "back issues are clearly described as 'worsening' [PageID.772] or 'deteriorating'. [PageID.875]." (R. 21, PageID.1970-71.) The first cited page never uses the word "worsening," and the full quotation provides critical context.[11] It appears under the "History of Present Illness" section, which contained Balknight's self-reports: "She [*i.e.*, Balknight] would like to try another round of injections, as the symptoms are getting worse." (R. 16, PageID.772.) In other words, it seems that the person reporting a worsening condition was Balknight herself. Thus, it does not provide objective evidence of deterioration.

The second cited page was from a July 2014 medical report after she reportedly "fell and exacerbated her back condition. Work up (per patient) did n[o]t show any new findings." (R. 16, PageID.874.) At the emergency room, while she displayed some tenderness and decreased range of motion, she denied any other musculoskeletal and neurological functioning, and she had normal gait, sensation, and reflexes, and negative straight leg raise tests. (*Id.*, PageID.639, 642-43.) During the relevant July 2014 office visit, she was again tender with decreased motion, but otherwise fine. (*Id.*, PageID.875.) The doctor—Donald Robinson—did note, in the assessment section, that her back pain had "[d]eteriorated." (*Id.*) But in context, this assessment appears related to her fall, not an ongoing deterioration. At the very least, the report fails to offer any other explanation for the deterioration. In fact, the end of the report instructed Balknight that "[m]ost patients

---

[11] *See The Chicago Manual of Style*, 13.6 (17th ed.) ("It is impossible to overemphasize the importance of meticulous accuracy in quoting from the works of others.").

(90%) . . . with low back pain will improve with time (2-6 weeks)." (*Id.*, PageID.876.) And even if the doctor thought her condition might be progressively worsening, subsequent examinations and reports (cited above) failed to flag any problems with strength, sensation, range of motion, or gait. *See, e.g.*, (*Id.*, PageID.1064, 1066, 1828, 1946-47.) As such, this record does not support the sort of deterioration Balknight suggests.

Next, Balknight notes that deterioration is also shown by the increased intensity of her treatments: previously, no surgery had been recommended, but now it was needed; Oxycodone was added to her medications; and while she had had injections before, she underwent over ten during the relevant period. (*Id.*, PageID.1971.)

Regarding the surgery, the prior ALJ noted that there was "no indication that surgery has been recommended." (*Id.*, PageID.166.) Now, Balknight cites a July 13, 2014 report from Dr. Sripada that stated, "She needs to have surgery, but her weight is a mitigating factor, and she is trying to lose weight." (*Id.*, PageID.758.) At best, this provides a weak inference of deterioration. It is weak because there is no explanation about why surgery may have been unnecessary before, nor does Dr. Sripada or any other source suggest that the need for surgery had developed since the last application. Moreover, Dr. Sripada does not explain why the surgery is necessary or even what type of surgery he would recommend. It appears related to her back, but he goes on to reference bariatric surgery for weight loss. It is unclear, therefore, that a progressively worsening back condition had necessitated surgery. And while obesity may have prevented her from undergoing surgery, it does not appear that is was recommended on any other occasion. *See* (*Id.*, PageID.599 (noting that surgery was refused due to her obesity), 764 (noting that, because of

Balknight's weight, a surgeon did not make any recommendations regarding surgery), 868 (she was unable to have surgery due to her weight).) One doctor thought it would provide only limited pain relief. (*Id.*, PageID.1032; *see also id.*, PageID.1499 (Balknight's report that she was told surgery might help her leg but do nothing for her back, and the decision was hers).) Thus, the evidence regarding her need for surgery does not support her claim that her condition significantly deteriorated or that the ALJ somehow erred under *Earley*.

Regarding her prescription for Oxycodone, she attempts to prove it is new by citing a single page in the prior ALJ decision that simply mentioned other medications Dr. Sripada had prescribed previously, and also citing a note from February 2015 mentioning she took Oxycodone. (*Id.*, PageID.86, 1827.) Even if this somehow establishes that she only recently was prescribed Oxycodone, she would still need to show that the prescription related to her worsening condition. She makes no attempt at proving this. And, in fact, pain medications represent conservative treatment. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir.2013) ("[H]is treatment [for extremity pain] was minimal and conservative during the period at question; [the claimant] was treated with medication only, and more recently simply over-the-counter medication."). Similarly, the injections she received constitute conservative treatment. *See Ashworth v. Sullivan*, 951 F.2d 348 (6th Cir. 1991) (holding that treatment of back pain with epidural steroid injections, mild medication, exercise, and a heating pad was conservative, and undercut plaintiff's complaints of pain). Balknight does not demonstrate that the nature of the injections changed or their frequency increased at all, let alone in a manner indicating a worsened condition.

Next, Balknight endeavors to show her deterioration by comparing a May 2014 EMG with an older one considered with the prior application. (R. 21, PageID.1999.) But she gets her information about the earlier evidence from the prior ALJ decision, which noted an August 2009 EMG "show[ing] axonal peripheral polyneuropathy with active denervation in the distal right lower extremity; with no electrodiagnostic evidence of a right tarsal tunnel syndrome." (R. 16, PageID.161.) The later EMG showed, in addition to neuropathy, that "[a]ll of the sample sensory responses were absent." (R. 16, PageID.1460.) To Balknight, this proves deterioration. But I am unswayed. For starters, without the actual 2009 EMG, she cannot be certain that the results are all that different. But even if they are, the upshot of absent sensory responses is murky. To a layperson's ears, it certainly sounds like a problem. But without any expert guidance, the Court would have to speculate as to the meaning and significance of this finding. Dr. Tummala, who drafted the EMG report, did not mention the absent sensory responses in the "Interpretation" section of the report but only in the "Summary." Consequently, Balknight's argument amounts to assuming that a *potentially* new finding shows deterioration without explaining what that finding actually demonstrates.

Balknight then pivots to her lupus diagnosis, which she received after the prior ALJ decision. (R. 21, PageID.1971.) By the end of this argument, she accuses the ALJ of playing doctor by concluding that her lupus symptoms were already present pre-diagnosis due to her degenerative joint disease and carpal tunnel syndrome. (R. 21, PageID.1972.) But to get to this point, Balknight plays doctor herself. She states that lupus does lead to joint pain, but "it also carries with it symptoms of rash, fatigue, joint pain, stiffness, fever,

or headaches." (*Id.*) She does not get this information from the record, though: it comes from the Mayo Clinic. (*Id.*, PageID.1971 (citing https://www.mayoclinic.org/diseases-conditions/lupus/symptoms-causes/syc-20365789).) The records, Balknight states, contain complaints of some of these symptoms. (*Id.*, PageID.1971-72.) Ergo, she tacitly suggests that the ALJ was wrong to not consider these symptoms as part of her lupus. (*Id.*)

It is one thing to use extra-record materials to understand the context or meaning of medical jargon in the record. But Balknight's argument goes further, essentially offering a self-diagnosis on the basis of her complaints and a website. What is missing from her argument is any evidence making the connection between these symptoms and her lupus.[12] Without that, I cannot conclude that the ALJ erred by failing to link symptoms with a condition.

Moreover, the ALJ's lupus analysis did not run afoul of *Earley* in any event. He simply noted that many of Balknight's symptoms remained the same, despite the new impairments and the apparent cessation of others. How this even relates to *Earley* is unclear. And, ultimately, Balknight has not even articulated a disagreement with the ALJ: he said that her consistent symptoms might have a new cause and she says that a new impairment, lupus, might cause the symptoms.

---

[12] She cites a swath of records for the proposition that "she was having Lupus flares that impacted her other impairments." (*Id.*, PageID.1972 (citing R. 21, PageID.1198-227, 1342, 1407).) None of those records explain how the lupus "impacted" other impairments, let alone that the lupus had a causal connection with the symptoms found on the Mayo Clinic website.

For these reasons, I suggest that Balknight's first argument does not entitle her to relief.[13]

## 2.    The RFC and Substantial Evidence

Balknight argues that "that the ALJ erred by interpreting raw medical data" to construct the RFC. (R. 21, PageID.1978.) "[T]here is no doctor who reviewed the evidence in the record and issued an opinion as to Balknight's ability to function," she notes. (*Id.*) The consultative examiner, Dr. Sayyid, did not provide a source statement regarding "Balknight's ability to perform substantial gainful activity." (*Id.*, PageID.1979.) Further, he opined only on whether she could do certain tasks, not whether she could sustain those tasks for a full workday. (*Id.*) The ALJ gave Dr. Sayyid's opinion only partial weight because it was based mostly on Balknight's subjective complaints; yet, according to Balknight, her complaints have support from objective evidence showing chronic depression, uncontrolled diabetes, neuropathy, and "radiculopathy/spondylosis." (*Id.*) Next, Balknight blasts the ALJ for observing that carpal tunnel syndrome is usually diagnosed based on positive Tinnel's or Phalen's tests, which were largely absent here, and that even EMGs could provide false positives or negatives. (*Id.*, PageID.1980.) The record establishes, in Balknight's opinion, that she would have trouble handling, fingering and feeling.[14]

---

[13] Balknight briefly mentions step 3—the listing analysis—in her *Earley* argument. (R. 21, PageID.1970, 1972.) For the sake of clarity, I will address her step-three arguments together below.

[14] Without any citation to the record, Balknight follows the above argument with the following footnote:

> Anticipating the Commissioner may argue harmless error, the VE clearly offered an erroneous option for occasional use of the hands, fingers and arms as a "call out operator" (DOT#237.367-014) not an "administrative support clerk". This is an obvious conflict.

The issue here is whether the ALJ went rogue when constructing the RFC, basing it off his own reading of medical data.

The Sixth Circuit has rejected a *per se* rule that ALJs must employ supporting medical opinions when constructing the RFC. As it recently noted, the court has declined to adopt "the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *see also Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017) (rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that Shepard was capable of light work"). The rationale is that the ALJ

---

While it does have occasional handling, fingering and feeling per the DOT, there is no assurance this is the job the VE intended as it is defined as "complies credit information, such as status of credit accounts, personal references, and bank accounts to fulfill subscribers' requests, using telephone. Copies information onto form to update information for credit record on file, or for computer input. Telephones subscriber to relay requested information or submits data obtained for typewritten report to subscriber". It seems apparent even from the description it would require more than occasional reaching, handling and fingering as well.

(*Id.*, PageID.1981 n.9.) Grammatically, this argument is hard to parse. For example, it says "*This* is an obvious conflict." What is "this"? And a "conflict" between what, exactly? The argument then says, "While *it* does have occasional . . . ." What is "it"? And what is being quoted? Balknight leaves the reader to figure this out on his or her own.

Apparently what Balknight means is that when, at the hearing, the hypothetical individual was limited to occasional handling, fingering, and feeling, the VE provided a figure of 30,000 jobs and a new code from the Dictionary of Occupational Titles corresponding to a call-out operator. (R. 16, PageID.141.) Balknight then notes that job's responsibilities and surmises that it is inconsistent with occasional reaching, handling, and fingering.

Balknight's argument is completely bootless. She acknowledges that the Dictionary's discussion of the call-out operator positions defines it as requiring occasional reaching, handling, and fingering. But, by her lights, this position seems inconsistent with occasional reaching, handling, and fingering; so she thinks the VE must have intended to provide a different job. Essentially, she thinks the Dictionary's description of call-out operator is internally inconsistent. Until a vocational expert or the Dictionary itself flags this issue, however, I decline Balknight's invitation to question this vocational matters.

has final responsibility for determining the RFC. *Rudd v. Comm'r of Soc. Sec.*, 531 F.

App'x 719, 728 (6th Cir. 2013) (citing SSR 96-5p, 1996 WL 374183 (July 2, 1996); *see*

*also* 20 C.F.R. § 404.1527(d)(2) (2016) (noting that no "special significance" is given to

medical opinions on a claimant's RFC). As such, "to require the ALJ to base her RFC

finding on a physician's opinion, 'would, in effect, confer upon the treating source the

authority to make the determination or decision about whether an individual is under a

disability, and thus would be an abdication of the Commissioner's statutory responsibility

to determine whether an individual is disable.'" *Id.* (quoting SSR 96-5p, 1996 WL 374183,

at *2.)

It is true, however, that medical opinions cover a lot of the same ground as RFC

assessments. The former are "statement[s] about what you can still do despite your

impairment(s) based on the acceptable medical source's findings." 20 C.F.R. §

404.1513(b)(6); *see also* SSR 96-5p, 1996 WL 374183, at *4 (quoting the regulation and

stating that the medical source statement is a 'statement about what you can still do despite

your impairment(s)' made by an individual's medical source and based on that source's

own medical findings"). The RFC, in turn, "is the most you can still do despite your

limitations." 20 C.F.R. § 404.1545(a)(1). Thus, the ALJ owes a medical source no special

deference when deciding what a claimant can do despite his or her limitations; at the same

time, medical sources give opinions on the same matter, and when they come from treating

sources and involve the nature and severity of an impairment, the opinion might be owed

controlling weight. 20 C.F.R. § 404.1527(c)(2); SSR 96-5p, 1996 374183, at *5 ("Although

the overall RFC assessment is an administrative finding on an issue reserved to the

Commissioner, the adjudicator must nevertheless adopt in that assessment any treating source medical opinion (i.e., opinion on the nature and severity of the individual's impairment(s)) to which the adjudicator has given controlling weight under the rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2).")

The caselaw, however, does not require the ALJ to obtain a medical expert opinion to formulate the RFC. *See Charbonneau v. Comm'r of Soc. Sec.*, 2:18-cv-10112, 2019 WL 960192, at \*15-17 (E.D. Mich. Jan. 11, 2019) (discussing the caselaw), *Rep. & Rec. adopted by* 2019 WL 952736 (E.D. Mich. Feb. 27, 2019). The Sixth Circuit just reaffirmed this conclusion, noting that "[n]o bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached." *Tucker v. Comm'r of Soc. Sec.*, __F. App'x__, 2019 WL 2418995, at \*5 (6th Cir. 2019); *see also Gant-Holmes v. Comm'r of Soc. Sec.*, No. 18-cv-12264, 2019 WL 3282741, at \*2-3 (6th Cir. July 22, 2019) (same); *Charbonneau*, 2019 WL 3282741, at \*17 ("I do not find any brightline rule that medical opinions must be the building blocks of the RFC. As [other cases] emphasized, however, 'the ALJ remains obligated to make a logical bridge between the evidence relied on and the conclusion reached. . . . Regardless of whether the ALJ was required to obtain a medical RFC, " . . . in order to make a decision on this issue, this Court "may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result."'" (citing Mc*Caig on behalf of McCaig v.*

*Comm'r of Soc. Sec.*, No. 16-11419, 2017 WL 4211047, at *8 (E.D. Mich. Aug. 25, 2017), *Rep. & Rec. adopted by* 2017 WL 4176734 (E.D. Mich. Sept. 21, 2017))).

The question, then, is whether the ALJ adequately explained how the evidence supported the functional limitations in the RFC. The only limitations Balknight seems to quibble with relate to her arm and hands. (R. 21, PageID.1979-1981.) As noted, she begins by taking issue with the ALJ's treatment of Dr. Sayyid's opinion. But Balknight's argument gets off track. For one thing, it gestures at a challenge to the ALJ's handling of Dr. Sayyid's opinion, but it does not develop that attack as an independent argument—instead, she is challenging the RFC, so to be relevant the digression on Dr. Sayyid must show that the ALJ somehow lacked substantial evidence for the RFC. Even so, the bulk of Balknight's argument on Dr. Sayyid does not help her case. As noted above, Dr. Sayyid found that despite lacking full reflexes and having "some paresthesia on the tips of her fingers and toes," she had no motor or sensory deficits, had fine and gross dexterity in her arms, had normal grip, and could complete a host of tasks with her hands and arms (such as picking up a pencil or opening a door). (*Id.*, PageID.917-19.) The ALJ gave the opinion partial weight because, among other things, its diagnoses relied heavily on Balknight's subjective complaints. (*Id.*, PageID.90.) Balknight criticizes the partial weighting, but it is not clear why: it would appear that, in light of the many capabilities Dr. Sayyid listed, Balknight might favor a limited weighing of the opinion.

In any event, Balknight comes slightly closer to the mark with the remainder of the ALJ's analysis of Dr. Sayyid's opinion. The ALJ noted that

> [a]s for carpal tunnel syndrome, the only neurological finding was some
> paresthesia of the tips of the fingers and toes and missing deep tendon
> reflexes in all four extremities, which is consistent with peripheral
> neuropathy. The findings of inability to perform rapid alternating hand
> movements and heel-to-shin test are also consistent with peripheral
> neuropathy. Carpal tunnel syndrome is rarely diagnosed without a positive
> Tinnel's and/or Phalen's test, clinically. Even positive EMG findings, in the
> absence of clinical signs would suggest a false positive. Likewise, negative
> EMG findings, in the presence of clinical signs, suggests a false negative.
> The clinical signs are the most compelling evidence of carpal tunnel
> syndrome. The claimant's complaints of painful wrists with movements
> cannot solely be attributed to carpal tunnel syndrome, as the record
> demonstrates other conditions, such as osteoarthritis, degenerative joint
> disease, and lupus that could cause pain issues without involvement of the
> median nerve, especially with the findings that fine and gross dexterity, and
> grip strength were normal.

(*Id.*) The questionable aspect of this discourse is the ALJ's commentary on how to diagnose carpal tunnel syndrome. But, for the reasons that follow, I find no error (let alone a reversible one) in the ALJ's discursion.

First, the ALJ was simply questioning Dr. Sayyid's diagnosis of carpal tunnel syndrome. Yet, the ALJ listed that syndrome as a severe impairment and explained that, ultimately, he discovered no worsening of this condition. (*Id.*, PageID.81, 91.) Thus, the ALJ did not reject a medical source's diagnosis based on his own reading of the data. Second, the ALJ fairly characterized Dr. Sayyid's findings, noting the signs like missing reflexes. Third, while the ALJ may have overstepped his role in stating that carpal tunnel syndrome is "rarely diagnosed" without positive Tinnel's and Phalen's tests, he was within his rights to observe that these tests are used to diagnose the syndrome. *See The Merck Manual*, 492 (17th ed.). Similarly, although speculations about false positives and false negatives on EMGs is likely beyond a layperson's ken, the ALJ here was not discussing or

doubting any particular EMG. The reference to EMGs was merely illustrative of his larger point. Consequently, I disagree that the ALJ exceeded his role by assessing raw medical data.

Balknight's fallback contention appears to be that, no matter the cause, her hands had limited functioning and the ALJ did not adequately explain why she could frequently handle, finger, and feel. (R. 21, PageID.1981.) But the burden to prove a lesser RFC falls on Balknight. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). By simply citing some of the evidence, such as the 2014 EMG and a few findings of abnormal reflexes or painful wrists, (*id.*, PageID.1980-81 (citing R. 16, PageID.917, 1460)), Balknight has failed to carry her burden. As noted above, the tests for carpal tunnel syndrome often were negative, (R. 16, PageID.1552-53, 1557-58, 1561, 1564, 1946-47), and she often had normal wrist movement, (*id.*, PageID.944-45, 1484). In addition, Dr. Sayyid's opinion regarding the specific capabilities with her hands (which the ALJ did not question) further supports the ALJ's conclusion. (*Id.*, PageID.919.) That the evidence might cut both ways does not support reversing the ALJ's decision, as courts cannot "review the evidence *de novo*, make credibility determinations nor reweigh the evidence." *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Accordingly, I suggest that Balknight's argument regarding the RFC does not warrant reversal or remand.

### 3. Subjective Symptoms

Balknight's next contentions come under the heading, "The ALJ's Subjective Symptom Analysis is Flawed. (R. 21, PageID.1983.) But not everything that follows

appears to relate to this topic, at least as it is traditionally interpreted. Consequently, I will go through all six paragraphs in the body of her argument after laying out the generally applicable law.

The regulations define "symptoms" as the claimant's "own description of [his or her] physical or mental impairment." 20 C.F.R. § 404.1502(i). In general, a two-step inquiry governs this analysis. The ALJ must first determine whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce an individual's symptoms, such as pain." 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016). Second, the "intensity and persistence of those symptoms" are examined "to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*; see generally 20 C.F.R. § 404.1529. In the second step, the ALJ considers a host of factors, including the claimant's "daily activities" and "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." 20 C.F.R. § 1529(c)(3)(i), (iv).

This assessment formerly led to a "credibility" finding. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). But as noted, the Commissioner recently "eliminat[ed] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p, 2017 WL 5180304, at *2. The claimant's "overall character or truthfulness" is not at issue, as it might be in court. *Id.* The Ruling thus shifts the focus from the claimant's credibility to the consistency of his or her

49

statements with the evidence. *DePrez v. Berryhill*, No. 3:16-cv-02632, 2017 WL 4938228,

at *18 (M.D. Tenn. Sept. 20, 2017), *rep. & rec. adopted by* 2017 WL 4918598 (M.D. Tenn.

Oct. 31, 2017).

As noted, Balknight has six somewhat disparate contentions. First, Balknight asserts

that

> [t]he ALJ contends that Balknight's statements are not entirely consistent
> with the medical evidence and other evidence in this record. [R. 16,
> PageID.88.] First, the ALJ is using a misapplication of the law as SSR 16-3p
> only requires that objective evidence reasonably be expected to produce
> those symptoms. SSR 16-3p.

(R. 21, PageID.1982.) This argument is underdeveloped and incorrect. The ALJ stated that

he found "the claimant's medically determinable impairments *could reasonably be*

*expected to produce* the above-alleged symptoms." (R. 16, PageID.88.) Balknight does not

explain how this statement in the decision—which basically says the same thing she does—

flouts SSR 16-3p. Rather, the ALJ agreed that the evidence reasonably suggested the

alleged symptoms; he then turned to the second step of the analysis. I find no error in this

two-step approach, which the regulations require. 20 C.F.R. § 404.1502(i).

Second, Balknight states,

> Here the ALJ contends the facts have been 'dramatically inconsistent'
> pointing to earnings in 2013 that extended her date last insured. [R. 16,
> PageID.88.] Yet, she was doing childcare for a child either age 8 or 9. [*Id.*,
> PageID.117.] No other questions were asked about what tasks were
> performed or when the work started in 2013, yet the ALJ uses this adversely
> to suggest Balknight is lying. *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000)
> (holding that ALJ must investigate the facts and develop the arguments). This
> is not allowed under SSR 16-3[p]. [R. 16, PageID.88.]

(R. 21, PageID.1982.) Balknight is referring to the following from the ALJ's decision:

> [T]he claimant's testimonial facts, both currently and historically have been dramatically inconsistent with the factual evidence of record. In her prior hearing before the previous ALJ [which occurred in August 2013, (R. 16, PageID.155)], which resulted in a denial issued December 27, 2013, she testified that she stopped her self-employment work in May 2011. After the decision issued, she filed self-employment tax returns claiming $11,000 in self-employment earnings in 2013. That resulted in continuing her coverage for Title II benefits to March 31, 2014 . . . .

(R. 16, PageID.88.)

It appears that Balknight is trying, in part, to make the following argument: there may have been no inconsistency between her prior testimony and her self-employment because it is possible she started that job after her prior testimony (as she notes, she was not questioned about when she started the job). That might be a good point, but it overlooks the fact that she gave the Commissioner the dates she worked: from January 2013 through May 2013. (*Id.*, PageID.427.) *See generally Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). So the ALJ was correct that her prior testimony (which Balknight does not dispute) fails to line up with the present information.

Balknight might have also had a valid argument that she never discussed the nature of the job; but again this fails, for multiple reasons. One is that she did let the Commissioner know at least how much she worked: eight hours a day, five days a week. (*Id.*) Another is that babysitting reasonably appears inconsistent with her assertions that, shortly after ending that job and with no intervening events occurring or maladies striking, she became

unable to clean, cook, do any household chores, or do any outside tasks. (*Id.*, PageID.436-37.) Perhaps she could explain how her babysitting was consistent with her assertions, but she never attempted to do so. And, in general, "[e]ven if the work you [*i.e.*, the claimant] have done was not substantial gainful activity, it may show that you are able to do more work than you actually did." 20 C.F.R. §§ 404.1571, 416.971. Ultimately, then, the ALJ was not wrong to highlight the discrepancies.[15]

Third, Balknight turns to her psoriasis:

> With regard to Balknight's psoriasis, the ALJ again appears to play doctor. He points to no medical evidence in this record. [R. 16, PageID.88.] . . . . Rather, the ALJ asserts that "Gradually increasing exposure to the sun is recommended for psoriasis, as UV light exposure is very helpful, and a recommended therapy, in treatment psoriasis". [R. 16, PageID.88.]. No doctor has stated this and her psoriasis flare has support in the objective record. (See e.g., [R. 16, PageID.1407]).

(R. 21, PageID.1982.) Balknight captures the gist of the ALJ's analysis: "In her testimony before this ALJ, she stated that she had psoriasis all over her body, and that she had to completely cover up, even her face, when she went outside because any exposure made it so much worse." (R. 16, PageID.88.) The ALJ thought this was inconsistent with the general treatment for psoriasis of "increasing exposure to the sun." (*Id.*)

Balknight is correct, and even the Commissioner does not attempt to defend the ALJ's analysis. (R. 22, PageID.2009 n.2.) But I agree with the Commissioner that any error was harmless. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (noting the "highly deferential standard of review" on this issue and finding that a single mistake

---

[15] And nothing in the ALJ's decision supports Balknight's gratuitous accusation that the ALJ insinuated she was a liar.

concerning the date of a ladder climbing incident was harmless given that the rest of the analysis was correct). The remainder of the ALJ's analysis—as discussed above and below—was accurate. And Balknight does not attempt to show how any error regarding psoriasis is outcome determinative; she does not explain how it led the ALJ to craft an insufficiently restrictive RFC. For example, the page she cites is a series of handwritten lines that appears to say "psoriasis" under the medical history section but offers no other indication (at least a legible one) about how psoriasis affects her functioning. (R. 16, PageID.1407.) Therefore, despite the error on this point, I see no reason to reverse or remand.

> Fourth, Balknight argues that
>
> [a]s noted supra, the ALJ focuses a great deal on CTS versus peripheral neuropathy and suggests improvement despite any treater's note in the record rendering that conclusion. (R. 33). The EMG showed that all of the sample sensory responses were absent and the motor amplitude responses were reduced or absent. (R. 1385). The CE reflected abnormal reflexes to both the upper and lower extremities. (R. 852). Most recently she had significant tenderness to her fingers with note that she was symptomatic for Lupus. (R. 1865). There is clearly evidence of neuropathy, CTS via the CE (R. 850) and Lupus impacting her upper extremities (R. 1865). The ALJ's lay assumption that there is improvement over time is simply flawed. (R. 33-34).

(R. 21, PageID.1983.) This argument is in response to the ALJ's observation that tests for carpal tunnel syndrome were often negative, her gait was generally normal, and that findings regarding her neurological system were also normal. (R. 16, PageID.88-89.) Balknight's argument on this point simply rehashes contentions I have rejected above. The ALJ here acknowledged evidence favoring Balknight—such as the EMG and other "clinical signs"—but found that the consistently normal examination findings were

inconsistent with her claims she needed assistive devices to walk and had problems with her hands. (*Id.*) The ALJ's findings were supported by substantial evidence, as discussed above, and he did not err by noting the gap between Balknight's claims and the evidence.

Fifth, Balknight takes issue with the following line from the ALJ's description of the evidence: "Dr. Sripada and Dr. Ebenezer stated that weight loss was the solution to her problems, as no surgical recommendations could be made due to her morbid obesity." (R. 16, PageID.86.) To this, Balknight responds:

> The ALJ contends that weight loss is the solution to her problems as no surgical recommendations could be made due to Balknight's morbid obesity. [R. 16, PageID.86]. This is simply false. Her doctor did write that "she needs to have surgery, but her weight is a mitigating factor, and she is trying to lose weight". [*Id.*, PageID.758]. She was trying to get stronger pain medications to lose weight which insurance would not cover and they were trying to get her in for a bariatric consultation. [*Id.*, PageID.758, 764].

(R. 21, PageID.1983.) Balknight is wrong. The ALJ did not propound his own conclusion that weight loss was the solution to her troubles—he was simply recounting the medical evidence. Thus, it is not clear that the ALJ's discussion had any impact on his assessment of her symptoms. But even so, the ALJ's description was accurate. Dr. Sripada said almost the identical thing: "Ms. Balknight understands clearly that weight loss is the solution to her problems. She has already been evaluated by a surgeon and no recommendations are being made surgically because of her weight." (R. 16, PageID.764.) And Dr. Ebenezer noted that surgery would only be partially effective and gave no suggestion that he was recommending it. (*Id.*, PageID.1032.) True, Dr. Sripada also stated that Balknight needed surgery, but as noted above he did not describe why or what type of surgery; and he said that her weight was impeding the surgery. (*Id.*, PageID.758.) This was not a formal

54

recommendation for surgery. Thus, to the extent Balknight's argument has any bearing on the ALJ's analysis of her symptoms, it is unpersuasive.

> Sixth, and finally,
>
> The ALJ's cursory assessment of Balknight's morbid obesity is flawed. [R. 16, PageID.86]. Balknight's obesity is morbid or extreme obesity. The Sixth Circuit has recognized that an ALJ must "consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) ).(quoting *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) ). "[Obesity] must be considered throughout the ALJ's determinations, 'including when assessing an individual's residual functional capacity,' precisely because 'the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately.' " *Shilo*, 600 F. App'x at 959 (quoting SSR 02-1P, 2002 WL 34686281, at *1). Here, the ALJ related a lack of surgery to obesity, but the ALJ did not provide any analysis to show that he took Balknight's BMI into account in considering her ability to stand, sit, walk and perform routine movement and necessary physical activity within the work environment.' Nor*ris v. Comm'r of Soc. Sec.*, 1:17-CV-587, 2018 WL 4405605, at *12–13 (S.D. Ohio Sept. 17, 2018).

(R. 21, PageID.1983-84.)[16] It is unclear what this argument is doing in the "symptoms" section of the brief, as it does not directly relate to the ALJ's assessment of Balknight's alleged symptoms under 20 C.F.R. §§ 404.1529, 416.929 or 16-3p, 2016 WL 1119029.

---

[16] Tucked in the last sentence of this paragraph, Balknight states, "Finally, despite very limited daily activities, the ALJ never addresses why such statements are incredible as she relies upon her uncle to perform all daily chores." (*Id.*, PageID.1984.) The implicit logic of this sentence is somewhat off: the fact that she claims the activities are limited does not, without more, give a reason for either believing or disbelieving the "statements" (presumably about the activities). Rather, the issue is whether the ALJ should have believed the statements to begin with. Balknight does not bother arguing why the ALJ should have believed the statements. The ALJ appropriately described Balknight's testimony and reports about daily activities, including that her uncle served as a chore provider. (R. 16, PageID.85-86.) Balknight does not uncover any inaccuracies in this discussion. The ALJ did not have to specifically reference these statements again when he explained why he concluded her subjective symptoms were inconsistent with the record. For the reasons above, substantial evidence supports the ALJ's assessment of Balknight's subjective symptoms.

Perhaps her argument regarding daily activities is so perfunctory because she found herself making it near the bottom of page 26 of her brief, past the page limit prescribed by our local rules. E.D. Mich. LR 7.1(d)(3). She never requested an extension, as the rules require. Exceeding page limits to toss in

In any event, this contention suffers from the same flaws as many of those above. Namely, she fails to explain how the condition (obesity) has any impact on her functioning. She bore the burden of "showing that [her] obesity significantly limits [her] physical ability to do basic work activities." *Blay v. Berryhill*, No. 16-13435, 2017 WL 4987677, at *3 (E.D. Mich. July 31, 2017), *Rep. & Rec. adopted by* 2017 WL 4051791 (E.D. Mich. Sept. 13, 2017). But as in *Blay*, where the record similarly revealed largely "normal gait, normal muscle strength and tone, and a full range of motion," Balknight has failed to demonstrate how her obesity limits her capabilities, let alone that the impairment is so great as to render her disabled. *Id.* As noted above, substantial evidence exists showing normal strength, gait, and mobility. *See, e.g.* (R. 16, PageID. 497, 503, 505, 514, 516, 517, 527, 528, 540-44, 550, 552, 556-58, 599-601, 639, 642-43, 1163-64, 1168-69, 1180-81, 1201, 1204-05, 1208, 1239, 1467, 1472, 1478, 1484, 1489, 1503, 1604, 1622-23, 1636, 1643.) Balknight has not pointed to any other evidence relating to her obesity that would overturn these findings. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) ("Essary next challenges the ALJ's assessment of her ability to work on the basis that the ALJ failed to consider the impact of her obesity. However, the ALJ did take Essary's obesity into account, stating in his decision that 'degenerative disc disease of the lumbar spine, obesity, hypertension, and major depressive disorder, can reasonably be expected to result in some degree of functional physical and mental limitations' . . . . The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present

---

undeveloped arguments is a bad use of a rules violation. *See* Terry Pratchett, *The Thief of Time*, 241 (2009) ("Look, that's why there's rules, understand? So that you *think* before you break 'em.").

evidence of any functional limitations resulting specifically from her obesity."); *Smith v. Astrue*, 639 F. Supp. 2d 836845 (W.D. Mich. 2009) ("Smith fails to identify any medical opinion suggesting that her obesity imposes limitations or restrictions more debilitating than those set forth in the ALJ's RFC determination. . . . Smith's failure to identify medical opinion supporting her allegation that obesity further restricts her ability to work means that she has not carried her burden of establishing disability (with obesity as part of the cause for the disability).").

Moreover, the ALJ did consider her obesity. He explained that "[t]he additional and cumulative effects of obesity have been considered in evaluating whether the criteria of any listed impairment is met or equaled, as well as in evaluating the claimant's residual functional capacity." (*Id.*, PageID.83.) Further, he noted that her weight affected her ability to undergo surgery. (*Id.*, PageID.86.) Balknight fails to explain how this was insufficient or what rule required him to say more. *Cf. Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442-43 (6th Cir. 2010) (noting that SSR 02-1p does not require any specific procedural format for the obesity analysis and that the ALJ sufficiently accounted for obesity by referencing it multiple times in the fact findings and also discussing a medical source's mentions of obesity); *Farnham v. Astrue*, 832 F. Supp. 2d 243, 261 ("[T]he ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities.").

For these reasons, I suggest that Balknight's subjective-symptoms argument should be rejected.

### 4.      Medical Opinion on Listing 1.04

Finally, Balknight claims that the ALJ erred by failing to obtain a medical opinion on whether she met or medically equaled a listing—here, the only one Balknight mentions is Listing 1.04 for spinal disorders. (R. 21, PageID.1973.) Claimants with impairments meeting or equaling a listing are deemed disabled at step three without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Each listing contains specific criteria that the claimant must satisfy to this step. 20 C.F.R. § 404.1525(c) (2016). When the criteria are not met, a claimant might still be rendered disabled by impairments equal to the listings. This equivalence comes in three scenarios:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.Appx. 411, 414 n. 2 (6th Cir.2011) (quoting 20 C.F.R. § 404.1526 (2011)).

At step three, ALJs retain discretion to accept or reject medical opinions on equivalence without attaching "any special significance to the source of an opinion . . . ." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Under a previous Ruling, SSR 96-6p, the Commissioner had affirmed the "longstanding policy requir[ing] that the judgment of a physician (or a psychologist) designated by the Commissioner on the issue of equivalence

on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." 1996 WL 374180, at *3 (July 2, 1996). With that Ruling as guidance, courts often remanded when the record lacked an expert opinion regarding equivalency. See *Moran v. Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 923 (E.D. Mich. 2014) (collecting cases).[17]

A new Ruling, however, reversed the Commissioner's position. In SSR 17-2p, the Commissioner permitted ALJ's to find lack of equivalency even when the record does not have a medical opinion:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.

2017 WL 3928306, at *4 (Mar. 27, 2017). Moreover, if the ALJ

> believes that the evidence already received in the record does not reasonably support a finding that the individual impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not

---

[17] Even so, courts recognized that the burden at step three remains on the plaintiff and, consequently, the ALJ's failure to consult experts about equivalence had been held irrelevant when the plaintiff failed to meet the burden. *See Buchanon v. Comm'r of Soc. Sec.*, No. 13-CV-14288, 2015 WL 927831, at *7 (E.D. Mich. Mar. 4, 2015) ("Even if the ALJ should have considered an expert medical opinion on the issue of equivalence, remand is not warranted because it is plaintiff who bears the burden to prove that she has an impairment(s) listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and for the reasons set forth above, plaintiff has failed to satisfy that burden here."). In other words, "The lack of a medical opinion on equivalence can be deemed harmless error in some cases." *Bukowski*, 2014 WL 4823861, at *4; *see also Rice v. Comm'r of Soc. Sec.*, No. 16-11330, 2017 WL 4925681, at *7 (E.D. Mich. Aug. 25, 2017) ("While it is a rare case that [an equivalence] determination can be made without a medical opinion, given the dearth of objective medical evidence in this case suggesting that plaintiff's impairments separately or in combination could meet or equal a Listing, the undersigned finds that the failure to obtain a medical opinion on equivalence is in fact, harmless error.").

medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

*Id.*

Consequently, courts have observed that "[u]nder SSR 17-2p, an ALJ need not obtain evidence from a medical expert on equivalence if the 'evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment.'" *Thurston v. Comm'r of Soc. Sec.*, No. 18-12744, 2019 WL 2617049, at *3 (E.D. Mich. June 10, 2019) (collecting cases; citation omitted), *Rep. & Rec. adopted by* 2019 WL 2613180 (June 26, 2019); *Mitchell v. Comm'r of Soc. Sec.*, No. 1:18-cv-808, 2019 WL 2125540, at *3 (W.D. Mich. April 19, 2019) ("In SSR 17-2p, the Social Security Administration clarified that an ALJ is not required to obtain a medical expert's opinion before making a finding that an individual's impairments do not equal a listing impairment . . . ."), *Rep. & Rec. adopted by* 2019 WL 2120121 (W.D. Mich. May 15, 2019); *Jammer v. Comm'r of Soc. Sec.*, No. No. 18-10445, 2019 WL 1372171, at *7 (E.D. Mich. Feb. 22, 2019) ("[T]he absence of a medical opinion on the issue of equivalency does not defeat the ALJ's Step Three findings."), *Rep. & Rec. adopted by* 2019 WL 1354037 (E.D. Mich. Mar. 26, 2019). As one Court applied the Ruling, "[U]nder SSR 17-2p, because the ALJ found that the evidence did not reasonably support a finding that Cooper's impairments medically equaled Listing 1.04(A), she was not required to first obtain medical expert evidence to support that finding, nor was she required to specifically articulate the bases for that

conclusion." *Cooper v. Comm'r of Soc. Sec.*, No. 18-12611, 2019 WL 2240711, at *5 (E.D.

Mich. April 8, 2019), *Rep. & Rec. adopted by* 2019 WL 2208151 (E.D. Mich. May 22,

2019).

Whether SSR 17-2p applies here is the first point of contention between the parties.

Balknight cites the Commissioner's Hearings, Appeals, and Litigation Law Manual, I-5-3-

30 ("HALLEX"), for the proposition that the old rules (presumably SSR 96-6p included)

apply to claims filed before March 27, 2017. (R. 21, PageID.1976-77.) Indeed, the

HALLEX states that "[f]or claim(s) filed before March 27, 2017, adjudicators must use the

prior rules throughout the entire appeals process." HALLEX, I-5-3-30, 2017 WL 1362776,

at *5 (April 14, 2017). But as the Commissioner points out, HALLEX goes on to

specifically direct ALJs to cite SSR 17-2p, and not SSR 96-6p, "[f]or claim(s) filed before

March 27, 2017." *Id.* at *5.

Balknight does cite one case that, seeing the tensions in the HALLEX, opted

(without any explanation) for applying the general statement that the "prior rules" apply

despite the more specific provision for SSRs 17-2p and 96-6p. *Atchley v. Berryhill*, No. 15-

5081-JLV, 2018 WL 1135457, at *5 (D. S.D. Feb. 28, 2018).[18] Neither that case nor

Balknight explain why this is the better reading of the HALLEX. The lack of justification

undercuts the conclusion, especially since under the usual reading of legal texts a specific

---

[18] Another case Balknight cites, *Foy v. Berryhill*, did not recognize the specific language in the HALLEX and instead applied SSR 96-6p. No. CBD-17-2743, 2018 WL 3707837, at *6 (D. Md. Aug. 3, 2018). The other relevant case Balknight cites did not examine the HALLEX but instead relied on Eleventh Circuit caselaw to hold that SSR 17-2p did not apply retroactively. *Baker v. Berryhill*, No. 5:17-cv-00921, 2018 WL 4635741, at *5 n.3 (N.D. Ala. Sept. 27, 2018). As explained in the text above and footnote 19 below, Balknight does not make a retroactivity argument independent of her discussion of the HALLEX, and it is not clear to me that applying SSR 17-2p to a subsequent ALJ decision constitutes retroactivity.

provision prevails over a more general provision. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, § 28 (2012). Balknight also fails to assert that applying SSR 17-2p to this case would be impermissibly retroactive.[19] Consequently, because the HALLEX directs use of SSR 17-2p, and Balknight's argument on this point relies only on the HALLEX, I conclude that SSR 17-2p applies. As such, the ALJ did not need to obtain a medical opinion if he reasonably concluded that the evidence did not support Balknight's meeting or equaling a listing; and the ALJ did not need to articulate his reasoning with any specificity.

Listing 1.04 addresses "[d]isorders of the spine," such as degenerative disc disease, that "result[] in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 1.04 (Sept. 2017). In addition, one of three showings must be made:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

---

[19] The lack of argument alone is enough to doom her efforts to apply SSR 96-6p. I would also note that, while many courts have applied the normal retroactivity analysis to social security rulings, one court in this District rejected that approach because such rulings lack the "force or effect of law in the same manner as do rules and regulations." *Gaffney v. Comm'r of Soc. Sec.*, No. No. 00–10336–BC, 2004 WL 192287, at *1 (E.D. Mich. Jan. 26, 2004). Further, it is not clear that applying a ruling promulgated months before the ALJ hearing constitutes retroactivity: the ruling governs the ALJ's actions (*i.e.*, obtaining a medical opinion) and was in effect before the ALJ was forced to decide the issue here. In general, however, a retroactive application is one that operates "on transactions that have occurred or rights and obligations that existed before the passage of the" law. 2 Singer, *Sutherland Statutory Construction*, § 41:1 (7th ed.). "[T]he court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268-269 (1994); *cf. id.* at 291 (Scalia, J., concurring in part and concurring in the judgment) ("The critical issue, I think, is not whether the rule affects 'vested rights,' or governs substance or procedure, but rather what is the relevant activity that the rule regulates."). That is, "retroactivity ought to be judged with regard to the act or event that the statute is meant to regulate," and here the act or event sought to be regulated had not yet occurred. Scalia & Garner, *supra*, at § 28.

Or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

Or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.* Ineffective ambulation occurs when, for example, the claimant needs assistive devices, cannot use public transportation, or cannot shop. *Id.* § 1.00(B)(2)(b)(2).

The Sixth Circuit discussed the "strict requirements" of 1.04A and B in *Lawson v. Comm'r of Sec. Sec.*, 192 F. App'x 521, 529, 530 (6th Cir. 2006). The former "requires a finding of limitation of motion of the spine and loss of motor reflex." *Id.* at 529. Because the plaintiff's reflexes and range of motion were normal in *Lawson*, she did not meet that listing. *Id.* at 529-530. The latter listing, 1.04(B), is not satisfied by a "bare assertion" that a physician diagnosed "'severe' degenerative disc disease" without the specific medical findings required by the listing. *Id.*

In the present case, no one disputes that the record lacks a medical opinion from a physician on this listing. In his decision, the ALJ explained that he did not call for a medical opinion because "there is a prior ALJ decision concluding that the listing are not met or equaled. I have concluded that the claimant's limitations, based on the current record, are not greater, and in fact, have more likely than not improved and are less, and I have

independently arrived at the same conclusion that the listings are not met or equaled." (R. 16, PageID.81.) Further, the ALJ observed that "there was a consultative examination, and the findings do not in any way suggest medical equivalence of a listing . . . . We have a plethora of medical exhibits and assessments. Nowhere do any of the treating records when taken as a whole suggest a listing level degree of impairment." (*Id.*, PageID.82.) Regarding Listing 1.04 in particular, the ALJ found "no evidence of the compromise of a nerve root or the spinal cord with evidence of nerve root compression, including motor loss, sensory or reflex loss, and if applicable, positive straight-leg raising test; spinal arachnoiditis resulting in the need for chances in position or posture more than once every two hours; or lumbar spinal stenosis with pseudoclaudication resulting in an inability to ambulate effectively." (*Id.*) [20] This ALJ's analysis went beyond what SSR 17-2p requires.

---

[20] During the hearing, the ALJ also explained why he declined obtaining an opinion. Balknight's representative had argued that her condition had deteriorated since her prior application was denied; and also pointed out that "no medical source has really rendered an opinion with regard to the listings based on this new" evidence. (*Id.*, PageID.109.) The ALJ responded that "I disagree with [the argument] slightly for this reason. If we were sitting here and there'd been no CEs I would agree with you 100 percent." (*Id.*, PageID.110.) Continuing, the ALJ noted, "And since the burden of proof still is on the Claimant at Step 3, my sense of it was that there's no evidence on the issue then the Claimant fails the burden of proof." (*Id.*) Single-Decision Makers—which was the only source of an opinion on Listing equivalence here—are not good enough, the ALJ acknowledged; but the courts "didn't apply that when there were CEs. If there was a CE done, so you did have a medical expert look at it and express an opinion, they [presumably the courts] saved that rule for the strictly for the [sic] ones that came down, came to us with not [sic] outstanding medical opinion and then we were put in a position where we had to come up with the RFC completely without any guidance from any physicians." (*Id.*, PageID.110-11.) Further, the ALJ explained, the prior decision's RFC was "extremely limited," such that any deterioration in her condition "creates a very great likelihood that the person [*i.e.*, Balknight] is going to qualify for disability." (*Id.*, PageID.111.) As such, "I think it would be a waste of time to postpose this for another hearing to get a medical expert." (*Id.*)

"I agree," Balknight's representative replied. (*Id.*) Later, the representative explained, "I agree with you about scheduling another" hearing, adding, "I'd rather have you do an interrogatory." (*Id.*, PageID.112.) But after the ALJ disagreed, the representative concluded, "let's move forward and I don't disagree with anything you've said." (*Id.*, PageID.113.) The representative's somewhat equivocal statements—repeatedly agreeing with the ALJ but noting towards the end that he would like the ALJ to issue interrogatories—appear close to having waived the argument. Nonetheless, the Commissioner here does not raise waiver and so I will not base my recommendation on it.

Once more, Balknight's tack is to cite some of the evidence showing impairments—here, among others, sensory loss, stenosis, positive straight leg raise tests, and some limitations in range of motion—but leave unaddressed the countervailing evidence the ALJ cited. (R. 21, PageID.1974-75.)[21] Again, however, substantial evidence (as cited above) supports the ALJ's general conclusion that Balknight's relevant functional limitations had not grown worse since the last ALJ decision. The records cited above demonstrate, for example, consistently normal gait, and thus meeting or equaling Listing 1.04(C) is impossible. *See, e.g.*, (R. 16, PageID.597-98, 671.) Also discussed above were the straight leg raises, which were positive a few times but often negative. *See* (*Id.*, PageID.643, 1342, 1473.) The same goes for most other relevant findings, all of which were examined above: on a few occasions she had undescribed muscle weakness or reflex deficits, but more often her strength and reflexes were normal. *See supra* at pp. 34-41.

Given this evidence, the ALJ was not unreasonable to conclude that Balknight could not meet or equal Listing 1.04. In particular, the ALJ could reasonably find that the record does not support the degree of functional limitations required by the Listing. Thus, even with the additional severe impairments of lupus and diabetic neuropathy, the ALJ's finding should stand.

### G.      Conclusion

For these reasons, I would conclude that substantial evidence does not support the

---

[21] While the ALJ's step-three analysis found no evidence of certain things, like sensory loss, the record did contain some such evidence; but the remainder of the ALJ's decision discusses all relevant evidence, including her sensory loss, tenderness, and imaging studies. (R. 16, PageID.85-91.)

Commissioner's denial of benefits and I recommend **DENYING** Plaintiff's Motion, (R. 21), **GRANTING** the Commissioner's Motion, (R. 22), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue

raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  July 31, 2019                          S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge